# 24-675

## In the
## United States Court of Appeals
### For the Second Circuit

---

TRACY FLANAGAN,

*Plaintiff-Appellant,*

– v. –

TRADER JOE'S EAST, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## BRIEF FOR PLAINTIFF-APPELLANT

JOSHUA R. GOODBAUM
GARRISON, LEVIN-EPSTEIN, FITZGERALD & PIRROTTI, P.C.
*Attorneys for Plaintiff-Appellant*
405 Orange Street
New Haven, Connecticut 06511
(203) 777-4425

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ............................................................................. iii

JURISDICTIONAL STATEMENT ................................................................. 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........................ 1

STATEMENT OF THE CASE AND FACTS ..................................................... 2

    A.    Tracy Flanagan Is a Top Performer for Trader Joe's, Rising through the Ranks to Regional Vice President ...................................... 3

    B.    Ms. Flanagan Discovers an Employee Embezzling Funds from the Company, for which She Receives a Warning ...................................... 4

    C.    Trader Joe's Repeatedly Approves Ms. Flanagan's Request to Take an Anniversary Family Trip in March of 2020 ...................................... 6

          1.    Ms. Flanagan's Manager Twice Approves the Trip ............. 6

          2.    Ms. Flanagan's Interim Manager Reaffirms His Peer's Prior Approval of Her Trip .................................................... 8

    D.    Trader Joe's Purportedly Terminates Ms. Flanagan for Taking the Family Trip Her Superiors Had Repeatedly Authorized ........................ 9

    E.    Ms. Flanagan's Male Peer Takes a Comparable Trip Just One Week Before Ms. Flanagan Without Incurring Any Discipline; Trader Joe's Replaces Ms. Flanagan with Men ................................................ 10

    F.    Ms. Flanagan Sues for Sex Discrimination; the District Court Grants Summary Judgment for Trader Joe's ........................................ 11

SUMMARY OF THE ARGUMENT .............................................................. 15

ARGUMENT .............................................................................................. 17

    I.    Legal Standards .............................................................................. 17

i

II.     Trader Joe's' Replacement of Ms. Flanagan with Men
        Is Independently Sufficient to Establish the Required
        Inference of Sex Discrimination at the *Prima Facie*
        Stage ...................................................................................... 19

III.    A Reasonable Jury Could Conclude that Trader Joe's'
        Stated Reason for Ms. Flanagan's Termination Was Not
        the Real Reason and That a Motivating Factor Was Her
        Sex ......................................................................................... 20

        A.     Trader Joe's' Termination of Ms. Flanagan for Something
               It Expressly Permitted Her To Do Is Sufficient Evidence
               of Pretext to Deny Summary Judgment ................................ 21

        B.     Trader Joe's' More Favorable Treatment of a Similarly-
               Situated Male Employee Is Sufficient Evidence of
               Pretext to Deny Summary Judgment ..................................... 24

CONCLUSION ............................................................................................ 28

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ...................................... 29

# TABLE OF AUTHORITIES

**Page**

## Cases

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................17

*Bart v. Golub Corp.*,
    96 F.4th 566 (2d Cir. 2024)...........................................17, 18, 19

*Caldwell v. KHOU-TV*,
    850 F.3d 237 (5th Cir. 2017).........................................................22

*Feingold v. New York*,
    366 F.3d 138 (2d Cir. 2004).........................................................25

*Flanagan v. Trader Joe's E., Inc.*,
    2024 WL 488008 (D. Conn. Feb. 8, 2024) ....................................2

*Foster v. Univ. of Md.–E. Shore*,
    787 F.3d 243 (4th Cir. 2015).........................................................22

*Graham v. Long Island R.R.*,
    230 F.3d 34 (2d Cir. 2000)...............................................21, 24, 27

*Koziara v. BNSF Ry. Co.*,
    840 F.3d 873 (7th Cir. 2016).........................................................23

*Kwan v. Andalex Grp. LLC*,
    737 F.3d 834 (2d Cir. 2013).............................................21, 24, 27

*Laxton v. Gap Inc.*,
    333 F.3d 572 (5th Cir. 2003).........................................................22

*Littlejohn v. City of New York*,
    795 F.3d 297 (2d Cir. 2015).........................................................19

*Mandell v. Cnty. of Suffolk*,
    316 F.3d 368 (2d Cir. 2003).........................................................25

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ........................................................ 12, 16, 18, 20, 24, 27

*McGuinness v. Lincoln Hall*,
    263 F.3d 49 (2d Cir. 2001)...................................................................24

*McKinney v. Off. of Sheriff of Whitley Cnty.*,
    866 F.3d 803 (7th Cir. 2017)...............................................................22

*Menaker v. Hofstra Univ.*,
    935 F.3d 20 (2d Cir. 2019)..................................................................18

*N.L.R.B. v. Howard Baer, Inc.*,
    99 F.3d 1139 (6th Cir. 1996)...............................................................22

*Naumovski v. Norris*,
    934 F.3d 200 (2d Cir. 2019)................................................................17

*Radwan v. Manuel*,
    55 F.4th 101 (2d Cir. 2022)...........................................24, 25, 26, 27

*Sessions v. Dimaya*,
    584 U.S. 148 (2018) ..........................................................................26

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502 (1993) ..........................................................................21

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) ..........................................................................20

*Tarshis v. Riese Org.*,
    211 F.3d 30 (2d Cir. 2000)..................................................................20

*Tolan v. Cotton*,
    572 U.S. 650 (2014) ............................................................................3

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013) ..........................................................................17

*Wallace v. Caring Solutions, LLC*,
    213 Conn. App. 605 (2022) ................................................................... 17

*Zimmermann v. Assocs. First Cap. Corp.*,
    251 F.3d 376 (2d Cir. 2001) ..................................... 12, 13, 14, 19

## **Rules, Laws, and Statutes**

28 U.S.C. § 1291 ........................................................................................ 1

28 U.S.C. § 1331 ........................................................................................ 1

28 U.S.C. § 1367 ........................................................................................ 1

42 U.S.C. § 2000e ...................................................................................... 1

Conn. Gen. Stat. § 46a-60 ......................................................................... 1

Fed. R. Civ. P. 56 ..................................................................................... 17

## JURISDICTIONAL STATEMENT

Tracy Flanagan sued Trader Joe's East, Inc. ("Trader Joe's") under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et seq.* ("CFEPA"). The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. The court granted Trader Joe's' motion for summary judgment on all claims and entered judgment for Defendant. (J.A. 550-63.)[1] Ms. Flanagan timely appealed, and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Tracy Flanagan presents evidence that Trader Joe's repeatedly gave her express permission to take the trip that it later cited as justification for her termination; that it failed to terminate or discipline a similarly-situated male employee for taking a comparable trip one week before Ms. Flanagan's; and that, after it terminated Ms. Flanagan, it replaced her with men. Given this evidence, the questions presented are:

---

[1] References to the Joint Appendix (filed herewith) are indicated as "J.A. __." References to the Special Appendix (filed herewith) are indicated as "S.P.A. __."

1

1.     Did the district court err by concluding that Ms. Flanagan did not create an inference of discrimination sufficient to present a *prima facie* case of sex discrimination, even though she was replaced by men?

2.     Did the district court err by failing to conclude that Trader Joe's' repeated and express authorization for Ms. Flanagan to take her planned trip sufficiently undermined its purported reason for her termination that a jury trial was necessary to determine the true reason?

3.     Did the district court err by failing to find evidence of disparate treatment where a male colleague of Ms. Flanagan's took a comparable vacation just one week before hers?

## STATEMENT OF THE CASE AND FACTS

Tracy Flanagan appeals from the judgment of the United States District Court for the District of Connecticut (Oliver, J.), granting summary judgment to Trader Joe's East, Inc. on her claims of sex discrimination under Title VII and Connecticut law.  The district court's decision is unreported and is available at *Flanagan v. Trader Joe's E., Inc.*, 2024 WL 488008 (D. Conn. Feb. 8, 2024) (*see also* J.A. 550-62).

The following description of the evidence presents the record in the light most favorable to Ms. Flanagan as the non-movant, in accordance with the legal

2

standard for summary judgment motions.  *See*, *e.g.*, *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014) (per curiam).

## A.  Tracy Flanagan Is a Top Performer for Trader Joe's, Rising through the Ranks to Regional Vice President.

During her 12 years of employment with Trader Joe's, Tracy Flanagan rapidly rose through the company ranks.  A year after her hire in 2008, Trader Joe's promoted her from the role of "novitiate" (or low-level employee in training) to the role of "captain" (or store manager).  (J.A. 51-52; J.A. 169.)  In this role, Trader Joe's entrusted Ms. Flanagan with opening high-profile stores in Massachusetts and Maine, and in 2011, she was named the nationwide Captain of the Year.  (J.A. 52; J.A. 123-24; J.A. 228 (¶¶ 11-12); J.A. 238 (¶¶ 11-12).)  In 2012, Trader Joe's again promoted Ms. Flanagan – this time to Regional Vice President ("RVP"), first for the Mid-Atlantic region and then for the Northeast region.  (J.A. 52-53; J.A. 124; J.A. 201-02 (¶ 3).)  As RVP for the Northeast region, Ms. Flanagan supported and oversaw scores of employees, from line workers up through "captains," in all Trader Joe's stores in Connecticut and New York other than New York City.  (J.A. 124; J.A. 138; J.A. 202 (¶ 4); J.A. 228 (¶¶ 14, 16); J.A. 238 (¶¶ 14, 16).)  She repeatedly achieved top sales volumes and growth, and her annual performance evaluations reflected her consistently excellent performance.  (J.A. 141; J.A. 320-21; J.A. 366-436.)

3

**B.    Ms. Flanagan Discovers an Employee Embezzling Funds from the Company, for which She Receives a Warning.**

In late 2019, Ms. Flanagan discovered that an assistant store manager had embezzled more than $75,000 from the company by processing fraudulent refunds. (J.A. 53; J.A. 455.)  She detected the theft while reviewing the company's refund reports.  (J.A. 53.)  After discovering the embezzlement, Ms. Flanagan immediately requested new reports to enable her to isolate the misappropriation; reviewed the new and older reports to confirm the theft; reported the theft to Ed Seeker, Executive Vice President ("EVP") and Ms. Flanagan's boss, and Laurie Mead, Vice President of Human Resources; and sought advice from Trader Joe's' chief lawyer about how to proceed.  (J.A. 55; J.A. 230 (¶¶ 24-27); J.A. 239 (¶¶ 24-27); J.A. 476 (¶ 3).)  She also met with the culprit, obtained a written confession from him, terminated him, and referred the case to law enforcement.  (J.A. 450 (¶ 26); J.A. 476 (¶ 3).)  (The employee was arrested and formally charged, and Trader Joe's sought full restitution of the embezzled funds.  (J.A. 450 (¶ 26).))

Before the theft, Ms. Flanagan as a matter of course "spot-checked" her refund reports every few weeks to evaluate whether any specific store's refunds were atypical.  (J.A. 54.)  For Ms. Flanagan and her RVP peers, checking refund reports was not an organizational "focus" or "priority" when compared to their day-to-day responsibilities, and Trader Joe's did not tell the RVPs how frequently

4

it expected them to check the reports.  (J.A. 54-56.)  As fellow RVP Ylana Ebba explained: "[I]t could have been any one of us [RVPs]" who missed this sort of theft.  (J.A. 56.)  Only after Ms. Flanagan discovered the embezzlement did Trader Joe's establish expectations for how frequently RVPs and captains should check the refund reports or the steps they should take in doing so.  (J.A. 476 (¶ 4).)

Nonetheless, in December 2019, in response to the embezzlement Ms. Flanagan had uncovered and addressed, Trader Joe's issued her a written warning.  (J.A. 455.)  The warning inaccurately suggested that the *company* – rather than Ms. Flanagan – had discovered the theft.  (J.A. 455; *see also* J.A. 119 (conceding that Ms. Flanagan brought the embezzlement to light).)  Trader Joe's required Ms. Flanagan to complete an "educational process" and to provide her boss and other RVPs with weekly recaps and best practices related to the refund reports.  (J.A. 125; J.A. 457.)

Ms. Flanagan did that and more: she trained her team on biweekly reporting; held one-on-one sessions with her captains; and conducted follow-up group meetings.  (J.A. 125.)  By February 2020, Ms. Flanagan's boss, Mr. Seeker, excused her from sending weekly reports, saying he was confident in her ability.  (J.A. 125.)  He emphasized that he was not terminating her, and he reassured her

5

that she need not "look[] over her shoulder . . . about everything that she was doing" because the issue had been resolved.  (J.A. 60; J.A. 322.)[2]

## C. Trader Joe's Repeatedly Approves Ms. Flanagan's Request to Take an Anniversary Family Trip in March of 2020.

### 1. Ms. Flanagan's Manager Twice Approves the Trip.

During her annual performance review with Mr. Seeker in January 2020, Ms. Flanagan requested time off to take a trip to celebrate her first wedding anniversary that coming March – a request Mr. Seeker approved.  (J.A. 60-61; J.A. 126; J.A. 131; J.A. 477 (¶ 5).)  In early February, she booked a trip to Cancun for the week, starting on Monday, March 16, to celebrate the milestone with her newly-blended family, including her husband, her adult stepdaughter, and her stepdaughter's soon-to-be fiancé.  (J.A. 60-61; J.A. 477 (¶ 5); J.A. 519-29.)  A month later, Ms. Flanagan verbally reminded Mr. Seeker of her anniversary trip, and he asked her to email him a reminder, which she did on March 4.  (J.A. 94; J.A. 126; J.A. 264-65.)  (Mr. Seeker had taken a medical leave in mid-February, but he continued to actively communicate with Ms. Flanagan through March 13. (J.A. 126; J.A. 131; J.A. 265-66.))

---

[2] In its decision granting summary judgment, the district court misstated the record concerning Ms. Flanagan's actions after she received the warning.  Specifically, the court wrote: "*In the weeks following receipt of the written warning*, Plaintiff was only digging in deeply into the refund reports every few months unless the numbers seemed off . . . ."  (J.A. 552 (emphasis added).)  That is what Ms. Flanagan was doing *before* she discovered the theft, not afterward. (J.A. 93.)

Consistent with Trader Joe's' expectation that RVPs handle their own coverage for vacations, Ms. Flanagan enlisted her fellow RVP Ms. Ebba to cover her region while she was away.  (J.A. 126; J.A. 282; J.A. 463.)  Ms. Flanagan confirmed that coverage on March 10 and also spoke and emailed with her captains about her impending trip.  (J.A. 103; J.A. 274-75; J.A. 490.)  The captains did not express any reservations and encouraged her to go.  (J.A. 274-75.)

On Friday, March 13, EVP Ben Myers – who typically supervised RVPs in other regions – announced on a RVP conference call that he would be covering for Mr. Seeker effective immediately.  (J.A. 266-68; J.A. 272; *see* J.A. 116-17; J.A. 126.)  In light of the burgeoning pandemic, Mr. Myers also encouraged the RVPs to minimize their travel where possible, not to travel with other RVPs, and to stay home if they felt sick, although he did not instruct anyone to cancel their planned travel, either professional or personal.  (J.A. 62-64; J.A. 96.)  Ms. Flanagan believed that Mr. Myers already knew about her upcoming trip, because "typically, when somebody is passing off coverage, you communicate with that person what's going on, whether it be vacation . . . or somebody is out sick."  Accordingly, she did not specifically raise her March 16 trip on the March 13 call.  (J.A. 63; J.A. 65.)

7

### 2. Ms. Flanagan's Interim Manager Reaffirms His Peer's Prior Approval of Her Trip.

Around dinnertime on Sunday, March 15 – the day before she and her family were scheduled to fly to Mexico – Ms. Flanagan emailed Mr. Myers out of an abundance of caution to confirm that he knew about her long-approved trip. (J.A. 488.) She wrote, in total:

> Ben, As I am loading my car, I just realized that I did not let you know that I am away next week. It was approved time away long before the virus outbreak and [I] had talked to Ed [Seeker] about the time away a few weeks ago. I certainly realize it is not ideal timing and although Ylana [Ebba] is covering me, I will have access to my phone and email. Believe it or not I am going to a place that has no reported cases and has not been impacted by the virus (Cancun). I went back and forth with my family and they voted to move forward with the trip (I was outvoted). As I have been doing, I will monitor my health while away and when I return. Tracy

(J.A. 488.) Later that night, Mr. Myers wrote back, replying simply: "Okay, good luck!" (J.A. 488.) He did not ask Ms. Flanagan not to go or instruct her to cancel her anniversary family trip (despite his authority to do so), let alone warn her that proceeding with the trip could jeopardize her job. (J.A. 175-76; J.A. 182; *see* J.A. 488.)

On Monday, March 16, Ms. Flanagan left for her anniversary trip, taking her work phone and laptop with her as she had on past trips. (J.A. 262; J.A. 275; J.A. 279; J.A. 289; J.A. 488.) When she left, there were no travel bans in place, and the border between Mexico and the United States remained open. (J.A. 73; J.A. 269-

8

70; S.P.A. 15-16; *see also* Dist. Ct. Dkt. No. 30-1, Def. Mem. in Support of Mot. for Summary Judgment (hereinafter "Def. Mem."), at 11 n.4.)  As of March 15, there were no reported cases of COVID-19 in Cancun; no employee in any store in Ms. Flanagan's region had tested positive for COVID-19; and Connecticut had not limited the size of in-person gatherings.  (J.A. 207 (¶ 24); J.A. 277; J.A. 290; J.A. 470-73; J.A. 488.)  In fact, in early April 2020, Trader Joe's' President of Stores Jon Basalone publicly said that the true COVID "panic buying" frenzy had occurred in Trader Joe's' stores "at the *beginning* of March" and had abated *before* Ms. Flanagan left for her trip.  (J.A. 508 (emphasis added).)

## D.   Trader Joe's Purportedly Terminates Ms. Flanagan for Taking the Family Trip Her Superiors Had Repeatedly Authorized.

By March 17, 2020 – the day after Ms. Flanagan arrived in Cancun – the circumstances surrounding COVID-19 had deteriorated, and Ms. Flanagan decided to return home early.  (J.A. 288-91.)  She booked the earliest return flight she could find, but that unfortunately was not until March 20.  (J.A. 290-91; J.A. 530-45.)

Despite Trader Joe's' repeated permission for Ms. Flanagan to take the trip, Trader Joe's ostensibly terminated her because of it.  On March 18, Mr. Myers notified her by text message.  The message read, in total:

> Tracy, [b]ased on your recent performance and your decision to take vacation during the current circumstances, we are ending your employment effective today.  We will work out a time to gather your equipment when you get back into the country.  Feel free to call/text

9

me or [Vice President of HR] Laurie Mead if you have any questions.
Ben

(J.A. 99-100.)  The decision to terminate Ms. Flanagan was made by Mr. Basalone
and Mr. Myers.  (J.A. 142-43; J.A. 145; J.A. 171-72.)  Before they reached their
decision, neither Mr. Basalone nor Mr. Myers investigated whether Ms. Flanagan's
stores were negatively affected by her trip.  Ms. Flanagan pleaded with the
executives to reconsider their decision, but Trader Joe's refused.  (J.A. 100-01;
J.A. 108-11; J.A. 293-95; J.A. 497-500.)

**E.  Ms. Flanagan's Male Peer Takes a Comparable Trip Just One Week Before Ms. Flanagan Without Incurring Any Discipline; Trader Joe's Replaces Ms. Flanagan with Men.**

The week before Ms. Flanagan's family anniversary trip to Cancun, Perry
Zettersten – a male RVP who, like Ms. Flanagan, ultimately reported to Mr.
Basalone – took a cross-country vacation to the West Coast of the United States.
(J.A. 63; J.A. 71-72; J.A. 113; J.A. 138-39; J.A. 163; J.A. 452 (¶ 47); *see also* Dist.
Ct. Dkt. No. 37, Def. Reply in Further Support of Mot. for Summary Judgment
(hereinafter "Def. Reply"), at 6.)  Mr. Zettersten arranged for his peer RVP Ms.
Ebba to cover his region.  (J.A. 163; J.A. 271.)  This was in early March, which –
as Mr. Basalone later described it – was a period of chaos at Trader Joe's, with
customers "storming" through stores and "clearing the shelves of anything they
could grab."  (J.A. 508.)  Shortly into his trip, Mr. Zettersten began to make plans

10

to return home early.  (J.A. 163.)  But it took him a few days to get back, because he could not find a flight.  (J.A. 163.)  Unlike Ms. Flanagan, though, Mr. Zettersten was not terminated for deciding to take a vacation during the onset of the pandemic.  (J.A. 63; J.A. 72; J.A. 163.)  In fact, he did not receive so much as a warning.  (J.A. 63; J.A. 71-72.)

After it terminated Ms. Flanagan's employment, Trader Joe's temporarily divided her responsibilities between three existing male RVPs.  (J.A. 80; J.A. 130; J.A. 452 (¶ 48); J.A. 475 (¶ 2).)  A few months later, it permanently replaced her with a new male RVP.  (J.A. 80; J.A. 475 (¶ 2).)

## F.  Ms. Flanagan Sues for Sex Discrimination; the District Court Grants Summary Judgment for Trader Joe's.

In 2021, after exhausting her administrative remedies, Ms. Flanagan sued Trader Joe's in federal court, claiming that her sex was a motivating factor in Trader Joe's decision to terminate her employment, in violation of Title VII and the CFEPA.  (J.A. 17-18 (¶¶ 52-58).)

After discovery, Trader Joe's moved for summary judgment.  (*See generally* Def. Mem.; J.A. 31-200.)  With respect to Mr. Zettersten, Trader Joe's admitted that he "did indeed travel," but it contended that – because he had departed "earlier" than Ms. Flanagan, immediately began making arrangements to cut his

11

trip short, and traveled within the U.S. – he was not similarly situated to Ms. Flanagan in all material aspects. (Def. Mem. at 16, 18.)

Ms. Flanagan opposed the motion. (*See generally* Dist. Ct. Dkt. No. 34, Pl. Mem. in Opp. to Def. Mot. for Summary Judgment (hereinafter "Pl. Opp."); J.A. 201-545.) Like Trader Joe's, she followed the familiar *McDonnell Douglas* burden-shifting framework, and she emphasized that she need only prove that her sex was "one contributing factor in Trader Joe's['] decision to terminate her." (Pl. Opp. at 12.) As to her *prima facie* case, she argued that she could "easily" meet her burden because "both her interim and permanent replacements were men." (*Id*.) To support that proposition, she principally cited *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 381 (2d Cir. 2001), which she summarized as "holding [that] a terminated employee, in gender discrimination suit under Title VII, met her burden of presenting a prima facie case . . . that adverse employment action occurred under circumstances giving rise to an interference of discrimination[] where she was replaced by a male." (Pl. Opp. at 12.) As to pretext, Ms. Flanagan argued that Trader Joe's' express authorization to take her trip and its later decision to terminate her for doing precisely what it repeatedly authorized was sufficient for a reasonable jury to find pretext; and that a reasonable

12

jury could find that she was treated less favorably than similarly situated male employees, including Mr. Zettersten. (*Id.* at 13-14, 24-25.)[3]

In its reply brief, Trader Joe's did not address its replacement of Ms. Flanagan with men, nor did it cite, let alone distinguish, the *Zimmermann* case. (*See generally* Def. Reply.)  Trader Joe's also confirmed that "the [b]asis" for its decision to terminate Ms. Flanagan's employment was "her decision to proceed with her vacation to Mexico, in the midst of a pandemic." (*Id.* at 4.)

The case sat fully briefed for nearly a year – until October 2023, when it was transferred to Judge Oliver shortly after his confirmation as a U.S. District Judge. (*See* J.A. 6 (Dist. Ct. Dkt. No. 40).)  Three months later, Judge Oliver granted summary judgment to Trader Joe's. (*See generally* J.A. 550-63.)  He did not hold oral argument on the motion. (*See* J.A. 2-7.)

In its opinion, the district court first enumerated some of the record evidence, including Ms. Flanagan's rapid rise at Trader Joe's, her discovery of the embezzlement, and her efforts to return back home the day after she arrived in Mexico. (J.A. 550-54.)  It then recited the summary judgment and burden-shifting

---

[3] Ms. Flanagan argued that other male RVPs also were similarly situated, including one who was absent from work due to parental responsibilities and others who were demoted from the RVP role following poor performance reviews. (Pl. Opp. at 28-29; J.A. 217 (¶¶ 52-53).)  For the purposes of this appeal, though, Ms. Flanagan is not advancing those coworkers as comparators and instead relies only on the comparison to Mr. Zettersten.

standards that apply to Title VII claims at the summary judgment stage. (J.A. 555-58.)

Turning first to the *prima facie* case of discrimination, the court concluded that Ms. Flanagan had failed to demonstrate that the circumstances gave rise to an inference of discrimination. (J.A. 557-60.) According to the court, Ms. Flanagan had attempted to meet this burden by pointing to the disparate treatment of similarly situated employees – namely, the "five male RVPs 'with negative performance issues [who] were demoted and reassigned, but not terminated' . . . and th[e] two male RVPs 'who took vacations during the Coronavirus pandemic [that] were not terminated.'" (J.A. 558 (quoting Complaint ¶¶ 48, 50).) The court concluded that the comparators were not similarly situated because "none of them took an international vacation at the height of the COVID-19 pandemic after first receiving a written warning or having negative performance issues." (J.A. 559.) The court did not address Ms. Flanagan's argument that her replacement by men easily stated a *prima facie* case under *Zimmermann*. (*See generally* J.A. 557-60.)

As to pretext, the court dismissed Ms. Flanagan's arguments in a single page. (*See* J.A. 561.) It did not address Ms. Flanagan's arguments related to comparators, the permission she repeatedly received to take the trip for which she was purportedly terminated, or Mr. Myers's message of "Okay, good luck!" (*See* J.A. 561.)

14

## SUMMARY OF THE ARGUMENT

After 12 years of committed employment with Trader Joe's, rising through the ranks from low-level Novitiate to Regional Vice President, Tracy Flanagan asked her boss if she could take a family trip to Mexico to celebrate her first wedding anniversary. Her boss approved her request – not once but twice. The day before she left in mid-March of 2020, as the COVID-19 pandemic was emerging, Ms. Flanagan yet again confirmed that she could take her planned trip. Her boss's reply: "Okay, good luck!" Just days later, and much to Ms. Flanagan's shock, Trader Joe's terminated her employment. It then replaced her with men.

Trader Joe's claims that it terminated Ms. Flanagan because she decided to take a trip during the pandemic. The evidence, however, would allow a reasonable jury to find that Ms. Flanagan repeatedly obtained permission for her trip – including the day before she left. And the evidence would allow that jury to find that Trader Joe's failed to terminate a male employee who took a comparable vacation just one week before Ms. Flanagan.

On the basis of this evidence, a jury reasonably could conclude that Ms. Flanagan's decision to take the trip was not Trader Joe's' real or complete reason for terminating her and, instead, that Ms. Flanagan's sex was at least a motivating factor – or played a part – in Trader Joe's' decision. In reaching the opposite conclusion, the district court failed to view the evidence in the light most favorable

15

to Ms. Flanagan and impermissibly substituted its interpretation of that evidence for the jury's. Specifically, the district court erred by: (1) failing to follow Second Circuit precedent that a qualified female employee's replacement by a man raises an inference of sex discrimination sufficient to state a *prima facie* case at step one of the burden-shifting inquiry described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); (2) failing to conclude that Trader Joe's' repeated and express authorization for Ms. Flanagan to take her planned trip sufficiently undermined its purported reason for her termination at *McDonnell Douglas* step three that only a jury could determine the true reason; and (3) failing to conclude that Ms. Flanagan was sufficiently similarly situated to her male colleague who took a vacation just one week before her for a jury to find evidence of disparate treatment on the basis of sex.

The summary judgment entered in favor of Trader Joe's should be vacated, and the case should be remanded for the jury trial to which Tracy Flanagan is entitled.

16

# ARGUMENT

## I. Legal Standards

Whether to grant summary judgment presents a question of law, which this Court reviews *de novo*. *Bart v. Golub Corp.*, 96 F.4th 566, 569 (2d Cir. 2024). This Court "may affirm [summary judgment] only if the record reveals no genuine issue of material fact for trial." *Id.* "[T]he 'genuine issue' summary judgment standard is very close to the 'reasonable jury' directed verdict standard," with "the inquiry under each [being] the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (internal quotation marks omitted); *see* Fed. R. Civ. P. 56.

In Title VII and CFEPA sex discrimination cases, the plaintiff withstands summary judgment where she offers sufficient evidence from which a reasonable jury could conclude that her sex was a "motivating factor" in her employer's challenged action. *See, e.g.*, *Naumovski v. Norris*, 934 F.3d 200, 213 (2d Cir. 2019) ("Under Title VII, a plaintiff may succeed simply by establishing that sex . . . was a 'motivating factor for any employment practice, even though other factors also motivated the practice.'") (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349 (2013)); *Wallace v. Caring Solutions, LLC*, 213 Conn. App. 605, 626 (2022) (holding that "the motivating factor test, and not the but-for test,

17

remains the applicable causation standard for claims of discrimination under CFEPA").  This Court has described the "motivating factor" inquiry – that is, whether sex was a motivating factor in an employer's decision – as asking "whether an adverse employment action was based, even in part, on sex discrimination."  *E.g., Menaker v. Hofstra Univ.*, 935 F.3d 20, 38 (2d Cir. 2019) (internal quotation marks omitted).  Moreover, the plaintiff does not need to *prove* discrimination at summary judgment; she only needs to show that a reasonable jury could find discrimination.  *See, e.g., Bart*, 96 F.4th at 569 ("Summary judgment is improper if the evidence is such that a reasonable jury could return a verdict for a nonmoving party.") (internal quotation marks omitted).

The analysis proceeds under the three-step burden-shifting framework articulated in *McDonnell Douglas Corp.*, 411 U.S. 792.  The plaintiff bears the initial burden of adducing evidence that: "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination."  *Bart*, 96 F.4th at 570 (internal quotation marks omitted).  If the defendant then articulates a legitimate, nondiscriminatory reason for its adverse action, the burden shifts back to the plaintiff to offer evidence that her "employer's stated reason was . . . just a pretext, or cover, for a discriminatory intent."  *Id*.  But the plaintiff is not required to demonstrate falsity: she "need only show that the employer's stated reason –

18

even if true or factually accurate – was not the 'real reason,' in the sense that it was not the *entire* reason due to a coexisting impermissible consideration." *Id.* at 575 (emphasis in original). If she does, summary judgment is inappropriate.

## II. Trader Joe's' Replacement of Ms. Flanagan with Men Is Independently Sufficient to Establish the Required Inference of Sex Discrimination at the *Prima Facie* Stage.

The district court initially erred by finding that Ms. Flanagan did not state a *prima facie* case of discrimination. Specifically, the court concluded that the circumstances of Ms. Flanagan's termination did not give rise to even a "minimal" inference of discrimination, *Zimmerman*, 251 F.3d at 381 – a burden this Court has described as various synonyms of "not onerous," *e.g., Bart*, 96 F.4th at 570. (Trader Joe's conceded the remaining three elements of the *prima facie* case. (*See* Def. Mem. at 15.))

The district court could reach that conclusion, however, only by entirely ignoring the evidence that Trader Joe's replaced Ms. Flanagan with men. As this Court has repeatedly explained – and as Ms. Flanagan expressly argued in her summary judgment briefing – "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the Title VII analysis[.]" *Zimmermann*, 251 F.3d at 381; *accord, e.g., Littlejohn v. City of New York*, 795 F.3d 297, 312-13 (2d Cir. 2015) ("[A]n inference of discrimination also arises when an employer

19

replaces a terminated . . . employee with an individual outside the employee's protected class."); *Tarshis v. Riese Org.*, 211 F.3d 30, 36 (2d Cir. 2000) ("[T]he fourth element of the *prima facie* case may be satisfied by a showing that the plaintiff[] . . . was replaced by someone outside his protected class."), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

The evidence that Ms. Flanagan was replaced by men is independently sufficient to demonstrate the required inference of discrimination at the first step of the *McDonnell Douglas* inquiry. Accordingly, Ms. Flanagan satisfied her initial burden of establishing a *prima facie* case of sex discrimination, and the district court's decision to grant summary judgment to Trader Joe's on this ground was erroneous.

## III. A Reasonable Jury Could Conclude that Trader Joe's' Stated Reason for Ms. Flanagan's Termination Was Not the Real Reason and That a Motivating Factor Was Her Sex.

Where the defendant-employer proffers a non-discriminatory reason for an adverse action (as Trader Joe's has here), the plaintiff-employee has several different means by which to rebut that explanation and therefore defeat summary judgment. One method is "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, [lawful] reasons for its action," since these "discrepancies" would allow "a reasonable juror [to] conclude that the [employer's] explanations were a pretext for a prohibited

20

reason." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013); *see also, e.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination."). Another path is to introduce evidence that similarly situated employees outside her protected class received more favorable treatment. *See*, *e.g.*, *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000) (reversing summary judgment and concluding that existence of comparators raised question as to pretext).

Here, Ms. Flanagan does both: she shows that a jury could find Trader Joe's' explanation implausible, and she shows that a jury could find that a similarly-situated man received better treatment. Separately and together, then, this evidence requires a jury trial to determine the true reason for Ms. Flanagan's termination.

### A. Trader Joe's' Termination of Ms. Flanagan for Something It Expressly Permitted Her To Do Is Sufficient Evidence of Pretext to Deny Summary Judgment.

Where an employer asserts that it terminated an employee for an action that the employer expressly authorized the employee to take, a reasonable observer could wonder whether that employer's *post hoc* assertion is worthy of belief. Accordingly, where a plaintiff-employee introduces evidence that the defendant-employer previously approved the same actions by the plaintiff that the defendant

21

later avows to justify its termination decision, the employee has satisfied her burden to create a triable issue on the question of pretext.

At least three Courts of Appeals – the Fourth, Fifth, and Seventh Circuits – have reasoned in published opinions that evidence that an employee had permission to take the same action that her employer identified as the reason for her termination supported a finding of pretext. *See McKinney v. Off. of Sheriff of Whitley Cnty.*, 866 F.3d 803, 811, 814 (7th Cir. 2017) (reversing summary judgment where "supervisors" gave employee "express permission" to use company credit card, then ostensibly terminated employee for doing so, which "was both wrong and dishonest"); *Caldwell v. KHOU-TV*, 850 F.3d 237, 244 (5th Cir. 2017) (reversing summary judgment where employer "not just sanctioned, but mandated" that employee spend less time completing certain work, then purportedly terminated employee for doing so); *Foster v. Univ. of Md.–E. Shore*, 787 F.3d 243, 253-54 (4th Cir. 2015) (finding sufficient evidence of pretext to deny summary judgment where employee "had been given permission to edit the office forms" that her employer had accused her of editing "without permission"); *Laxton v. Gap Inc.*, 333 F.3d 572, 580-81 (5th Cir. 2003) (affirming jury verdict for employee where a jury "could have inferred" that employee's asserted "violation[s] involved conduct that [employer] authorized" employee to take); *see also N.L.R.B. v. Howard Baer, Inc.*, 99 F.3d 1139, at *6 (6th Cir. 1996) (unpub.)

22

(finding sufficient evidence of pretext where employer claimed it terminated employee for omitting information from his resume after employer previously acknowledged and endorsed the omission); *cf., e.g.*, *Koziara v. BNSF Ry. Co.*, 840 F.3d 873, 878 (7th Cir. 2016) ("The plaintiff does not argue that [his employer] believed that he was permitted to take the railroad ties [which he was terminated for taking], in which event the stated reason for his being fired would have been pretextual.") (emphasis omitted).

So too here. Two months before her anniversary family trip to Mexico, Tracy Flanagan requested and received approval from her supervisor. A month later, she reminded him of the trip over the phone and by email. The night before she left, she emailed her interim supervisor to confirm – for at least a third time – that she was going on her previously-approved vacation. He replied: "Okay, good luck!" He did not instruct her to cancel her trip; did not attempt to call her; and did not warn her that her job might be on the line. Ms. Flanagan reasonably interpreted these approvals as what they were: approvals. So when she opened the text message terminating her just days later, she was dumbfounded and in "complete shock[.]" (J.A. 109.) She had merely done what her company repeatedly authorized her to do. A jury *could* interpret this back-and-forth – Trader Joe's' approval-then-disapproval – as senior management changing its mind. But a reasonable jury also could understand it as the company

23

"contradicti[ng]" itself, *Kwan*, 737 F.3d at 846; and it could find that contradiction to be evidence of pretext – that is, that Ms. Flanagan's decision to take vacation was *not* Trader Joe's' true reason for terminating her. That is sufficient to meet her burden at *McDonnell Douglas* step three.

**B.   Trader Joe's' More Favorable Treatment of a Similarly-Situated Male Employee Is Sufficient Evidence of Pretext to Deny Summary Judgment.**

Ms. Flanagan presents a second and independently sufficient path by which a reasonable jury could find Trader Joe's' explanation for her termination unworthy of belief: a similarly situated man did essentially the same thing without consequence. "Under Title VII, discriminatory intent can be shown by . . . showing disparate treatment among similarly situated employees." *Radwan v. Manuel*, 55 F.4th 101, 132 (2d Cir. 2022). The comparator – that is, the differently-treated employee outside of the plaintiff's protected class – need not be "*identically* situated" to the plaintiff; "it is sufficient that the employee to whom plaintiff points be similarly situated in all material respects." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) (emphasis in original); *accord, e.g.*, *Graham*, 230 F.3d at 39-40. "What constitutes 'all material respects' therefore varies somewhat from case to case[.]" *Radwan*, 55 F.4th at 132 (internal quotation marks omitted). The question is "(1) whether the plaintiff and [comparator] were

subject to the same workplace standards and (2) whether the[ir] conduct . . . was of comparable seriousness." *Id.* (internal quotation marks omitted).

In most cases, the question of whether two employees are sufficiently similarly situated is one for the jury to resolve at trial. *See Radwan*, 55 F.4th at 132 ("Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury.") (quoting *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)); *Feingold v. New York*, 366 F.3d 138, 154 (2d Cir. 2004) ("[W]hether or not the non-disciplined [comparators] were similarly situated is a matter of factual dispute which is best resolved by a finder-of-fact, and not on summary judgment."). The issue for the court at summary judgment is merely whether the plaintiff has offered enough evidence for the jury to answer that question in the affirmative. *See Mandell*, 316 F.3d at 379.

Here, Ms. Flanagan easily has. She and Mr. Zettersten were both RVPs; they were both subject to the workplace standards for RVPs; they both had the same two-up boss, Mr. Basalone; they both took a long-distance vacation in March 2020; they both attempted to return early from their trips; they both had trouble booking new return flights; and they both returned to in-person work a few days after they wanted. Yet whereas Ms. Flanagan lost her job, Mr. Zettersten experienced no consequences whatsoever.

25

Despite these uncanny similarities, Judge Oliver dismissed the comparison between Ms. Flanagan and Mr. Zettersten because, in his words, Mr. Zettersten did not "[take] an international vacation at the height of the COVID-19 pandemic after first receiving a written warning or having negative performance issues." But as Justice Kagan is fond of saying, that is "slicing the baloney mighty thin." *E.g.*, *Sessions v. Dimaya*, 584 U.S. 148, 161 (2018). After all, "to survive summary judgment," a discrimination plaintiff need not "demonstrate that a proposed comparator committed the exact same misconduct as she did or . . . present an identical factual analog to her situation." *Radwan*, 55 F.4th at 133-38 (holding that reasonable jury could find that female soccer player who "made an obscene gesture on national television while representing UConn" after the end of a game was similarly situated to a male football player "who kicked a dead ball into the stands during a [non-televised] game," and therefore vacating summary judgment on sex discrimination claim).

Upon inspection, none of the three differences the district court identified surmount the "material[ity]" threshold that this Court imposes as a matter of law. First, that one employee's vacation was "international" and the other's cross-continental makes no difference, as both employees had to and did fly to get home. Second, if Ms. Flanagan traveled "at the height of the COVID-19 pandemic," then so did Mr. Zettersten. (If anything, Mr. Zettersten's conduct was worse, since he

26

traveled in early March when COVID "panic buying" was in full swing; whereas Ms. Flanagan traveled the following week when, per the company's President of Stores, it was not.) And third, the RVPs' respective disciplinary histories are irrelevant, because Mr. Zettersten's trip resulted in no discipline at all. (If – counterfactually – he had received a final warning and she had received similar discipline but been terminated because of her prior warning, that might not support an inference of disparate treatment. But that is not what happened.) "Viewing the facts in the light most favorable to [Ms. Flanagan]," then, "a reasonable jury could conclude that [Mr. Zettersten] was sufficiently similar in all material respects to [Ms. Flanagan] to raise an inference that, but for her gender, she would not have [been terminated]." *Radwan*, 55 F.4th at 135.

\* \* \*

Summary judgment is inappropriate at *McDonnell Douglas* step three where the employee offers evidence from which a reasonable jury could find "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Kwan*, 737 F.3d at 845. And summary judgment is likewise inappropriate at *McDonnell Douglas* step three where the employee offers evidence from which a reasonable jury could find that a "similarly situated employee[] belonging to a different . . . group received more favorable treatment" than the plaintiff. *Graham*, 230 F.3d at 43. Tracy Flanagan

27

has offered evidence of both.  Summary judgment is therefore doubly
inappropriate in this case, and Trader Joe's' motion should have been denied.

## CONCLUSION

The evidence would allow a reasonable jury to conclude that Trader Joe's
terminated Ms. Flanagan for something it expressly and repeatedly authorized her
to do; that it failed to terminate or discipline a similarly-situated male employee
despite his substantially comparable conduct; and that, after terminating her, it
replaced her with men.  The district court nonetheless granted summary judgment
to Trader Joe's.

That was error.  The judgment of the district court should be reversed, and
this case should be remanded for the jury trial to which Tracy Flanagan is entitled.

Dated: June 18, 2024

**RESPECTFULLY SUBMITTED,**
**THE PLAINTIFF-APPELLANT**

By:  */s/ Joshua R. Goodbaum*
Joshua R. Goodbaum (ct22834)
GARRISON, LEVIN-EPSTEIN,
FITZGERALD & PIRROTTI, P.C.
405 Orange Street
New Haven, CT 06511
Tel.: (203) 777-4425
Fax: (203) 776-3965
jgoodbaum@garrisonlaw.com

COUNSEL FOR PLAINTIFF-APPELLANT

28

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because it contains **6,606** words.

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has

been prepared in a proportionally spaced typeface using Microsoft Word 2016 in

14-point Times New Roman font.


*/s/ Joshua R. Goodbaum*
Joshua R. Goodbaum (ct22834)

29