# 24-675

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

TRACY FLANAGAN,
*Plaintiff–Appellant,*

v.

TRADER JOE'S EAST INC.,
*Defendant–Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

**BRIEF OF DEFENDANT–APPELLEE
TRADER JOE'S EAST INC.**

Anjali S. Dalal
WIGGIN AND DANA LLP
437 Madison Avenue, 35th Floor
New York, NY 10022
(212) 551-2846
adalal@wiggin.com

Jeffrey R. Babbin
Mary A. Gambardella
Caroline B. Park
WIGGIN AND DANA LLP
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
(203) 498-4400
jbabbin@wiggin.com

*Attorneys for Defendant–Appellee
Trader Joe's East Inc.*

**CORPORATE DISCLOSURE STATEMENT**

Trader Joe's East Inc. is a wholly-owned subsidiary of Trader Joe's Company. Trader Joe's Company is a wholly-owned subsidiary of T.A.C.T. Holding, Inc. There are no other parent corporations or publicly-held corporations that own ten percent (10%) or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF AUTHORITIES ...................................................................... iv

STATEMENT OF THE ISSUE ................................................................... 1

INTRODUCTION ............................................................................... 2

STATEMENT OF THE CASE .................................................................... 4

   I.  Plaintiff had an eleven-year upward trajectory with Trader Joe's .................. 4

   II.  Beginning in 2019, Plaintiff made multiple management errors ..................... 5

       A.  In January 2020, Plaintiff received a written warning after a significant management failure to uncover employee theft. ........................................ 5

       B.  In mid-March 2020, Plaintiff took a vacation to Mexico, amidst the chaos and fear that accompanied the onset of the coronavirus pandemic, and was terminated for her extraordinarily poor leadership decision. .................................................................................... 8

   III. Plaintiff accused Trader Joe's of sex discrimination, but the District Court granted summary judgment for Trader Joe's because Plaintiff had no evidentiary support for her claim. ............................................................ 18

SUMMARY OF THE ARGUMENT ............................................................. 21

LEGAL STANDARDS ........................................................................ 22

ARGUMENT ................................................................................. 25

   I.  Plaintiff's argument that she established a *prima facie* case for discrimination without showing disparate treatment is not a basis for reversal. ..................................................................................... 25

   II.  Defendant has established a legitimate non-discriminatory reason for Plaintiff's termination. ......................................................................... 28

   III. Plaintiff failed to demonstrate that Trader Joe's reasoning is pretext for sex discrimination. ............................................................................. 30

A.  Plaintiff failed to identify facts that call Trader Joe's explanation for Plaintiff's termination into question. ........................................................31

B.  Plaintiff failed to identify any similarly situated male employees that were treated more favorably.....................................................................39

CONCLUSION ........................................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abdu-Brisson v. Delta Air Lines, Inc.*,
   239 F.3d 456 (2d Cir. 2001) .................................................................26, 28, 29

*Bentley v. AutoZoners, LLC*,
   935 F.3d 76 (2d Cir. 2019) .......................................................19, 21, 22, 23, 24

*Bickerstaff v. Vassar Coll.*,
   196 F.3d 435 (2d Cir. 1999) .................................................................................45

*Bucalo v. Shelter Island Union Free School Dist.*,
   691 F.3d 119 (2d Cir. 2012) .................................................................23, 24, 30

*Caldwell v. KHOU-TV*,
   850 F.3d 237 (5th Cir. 2017) .............................................................................37

*Cruz v. Coach Stores, Inc.*,
   202 F.3d 560 (2d Cir. 2000) ...............................................................................28

*Fleming v. MaxMara USA, Inc.*,
   371 F. App'x 115 (2d Cir. 2010) .......................................................................21

*Foster v. University of Maryland–Eastern Shore*,
   787 F.3d 243 (4th Cir. 2015) .............................................................................37

*Graham v. Long Island R.R.*,
   230 F.3d 34 (2d Cir. 2000) .................................................................25, 26, 40

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
   412 F.3d 418 (2d Cir. 2005) ...............................................................................20

*Kovaco v. Rockbestos-Suprenant Cable Corp.*,
   834 F.3d 128 (2d Cir. 2016) ...............................................................................19

*Laxton v. Gap Inc.*,
   333 F.3d 572 (5th Cir. 2003) .............................................................................38

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973)........................................................ 19, 20, 21, 23, 24, 26

*McKinney v. Office of Sheriff of Whitley County*,
866 F.3d 803 (7th Cir. 2017) ......................................................32, 33, 34, 36, 37

*Naumovski v. Norris*,
934 F.3d 200 (2d Cir. 2019) .........................................................21, 24

*Radwan v. Manuel*,
55 F.4th 101 (2d Cir. 2022) ...................................................................44

*Ragin v. Riverbay Corp.*,
No. 20-2233-CV, 2021 WL 4057196 (2d Cir. Sept. 7, 2021)...........................23

*Raspardo v. Carlone*,
770 F.3d 97 (2d Cir. 2014) ....................................................................25

*Reeves v. Sanderson Plumbing Prod., Inc.*,
530 U.S. 133 (2000)........................................................................21, 24, 38

*Scaria v. Rubin*,
117 F.3d 652 (2d Cir. 1997) ...................................................................44

*Shumway v. United Parcel Service, Inc.*,
118 F.3d 60 (2d Cir.1997) .......................................................26, 39, 44

*Toussaint v. NY Dialysis Servs., Inc.*,
230 F. Supp. 3d 198 (S.D.N.Y.), *aff'd*, 706 F. App'x 44 (2d Cir. 2017) ...............................................................................................43

*Vega v. Hempstead Union Free School Dist.*,
801 F.3d 72 (2d Cir. 2015) ....................................................................25

*Wallace v. Caring Sols., LLC*,
213 Conn. App. 605 (2022) ..............................................................21, 23, 24

*Weinstock v. Columbia Univ.*,
224 F.3d 33 (2d Cir. 2000) .......................................................................22, 23

*Zimmermann v. Associates First Capital Corp.*,
251 F.3d 376 (2d Cir. 2001) .......................................................................26, 27

**Statutes and Rules**

Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60, *et seq.* ........................................................................18

Title VII, 42 U.S.C. § 2000e, *et seq* ................................... 18, 21, 22, 23, 24, 39, 45

D. Conn. Civil Local Rule 56(a)2 ...........................................................41

D. Conn. Civil Local Rule 56(a)3 ...........................................................41

**Other Authorities**

Associated Press, *The Latest: US advises Americans to reconsider travel abroad* (Mar. 11, 2020), https://apnews.com/article/united-nations-wa-state-wire-religion-travel-virus-outbreak-57d413557858077d861f846670ca3515 ...........................................42

At Novel Coronavirus Briefing, Governor Cuomo Declares State of Emergency to Contain Spread of Virus, March 7, 2020, https://www.governor.ny.gov/news/novel-coronavirus-briefing-governor-cuomo-declares-state-emergency-contain-spread-virus ......................8

Danielle Abreu, *The Day Everything Changed: A Timeline of March 11, 2020*, National Broadcasting Corporation (Mar. 11, 2021), https://www.nbcsandiego.com/news/coronavirus/the-day-everything-changed-a-timeline-of-march-11-2020/2545558/ ...........................42

David Ingram et al., *"It felt like the world was falling apart": An oral history of the day that changed America*, NBC News (Mar. 11, 2021), https://www.nbcnews.com/news/us-news/-felt-world-was-falling-apart-oral-history-day-changed-america-rcna394 ...................................42

Declaration of Public Health and Civil Preparedness Emergences, March 10, 2020, https://portal.ct.gov/-/media/Office-of-the-Governor/News/20200310-declaration-of-civil-preparedness-and-public-health-emergency.pdf ...........................................................9

Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15,337 (Mar. 18, 2020) ...................................................................................9

Eyewitness News, *Watch the newscast from the night the world changed – March 11, 2020*, American Broadcasting Corporation (Mar. 11, 2023), https://abc7ny.com/nys-covid-new-york-nyc-tom-hanks-coronavirus/12943718/ .............................................................. 42

Laurel Wamsley, *March 11, 2020: The Day Everything Changed*, National Public Radio (Mar. 11, 2021), https://www.npr.org/2021/03/11/975663437/march-11-2020-the-day-everything-changed .................................................................. 42

## STATEMENT OF THE ISSUE

Where Trader Joe's terminated the plaintiff, a regional store manager, because of her lack of judgment and managerial leadership when departing on an international family vacation on March 16, 2020—at the height of the uncertainty and chaos surrounding the coronavirus pandemic—did the District Court correctly grant summary judgment to Trader Joe's because the plaintiff failed to present an issue for trial that she was terminated due to her sex, including because (a) Trader Joe's articulated a legitimate, non-discriminatory reason for her termination, and (b) the plaintiff failed to present evidence reasonably suggesting that Trader Joe's legitimate, non-discriminatory reason for her termination was simply pretext for sex discrimination?

## INTRODUCTION

On March 7, 2020, New York State declared a state of emergency and directed its Consumer Protection Division to launch an investigation into reports of unfair price increases of consumer products such as household cleaning supplies and hand sanitizer amid the coronavirus outbreak. Three days later, Connecticut declared a public health emergency, authorizing the Commissioner of Public Health to delegate the powers regarding isolation or quarantine to municipal and district directors of public health. Then, three days after that, on March 13, 2020, the President declared a national emergency, as more and more people across the country were falling sick.

Meanwhile, Defendant Trader Joe's East Inc. ("Defendant" or "Trader Joe's") kept its doors open, working hard to keep its Crew Members safe as they continued to sell groceries to the customers in their neighborhoods even while a novel, dangerous virus was spreading rapidly. It was an unprecedented time at Trader Joe's—with demand so high that they could barely keep the shelves stocked. And in those early days of the pandemic, the situation seemed to get progressively worse with each passing day. On March 13, the same day that the President declared a national emergency, Trader Joe's let its senior leadership know that they should minimize travel—to reduce chances of unnecessary

2

exposure and to keep people with their teams to fully support them during this frightening and chaotic time.

Despite that instruction, and amidst the chaos, on March 16, 2020, Plaintiff Tracy Flanagan ("Plaintiff"), a Regional Vice-President responsible for stores in Connecticut and portions of New York heavily affected by the Covid-19 crisis, decided to go on a family vacation to Cancun, Mexico. Plaintiff knew it was not a wise choice but told her supervisor in a glib email, shot off as she was packing her car for the drive to the airport, that she was "out voted" by her family and thus had to proceed with the trip. She then emailed the store managers she supervised, in an equally glib and utterly irresponsible email, "I guess I'm going to Mexico," and suggested they "try to have fun" at work.

Plaintiff's own supervisors, themselves working inordinate hours, had a predictably strong reaction to this conduct. As the record demonstrates, Plaintiff's choice to take an international vacation at that critical juncture was viewed by Plaintiff's supervisors as showing exceptionally poor judgment and leadership with a total lack of accountability. Plaintiff's employment was therefore terminated while she was on vacation so that she could be swiftly replaced by a leader who understood the gravity of the situation and was ready to lead their team.

Although Trader Joe's business decision to terminate Plaintiff was fully within its rights, Plaintiff ultimately accused Trader Joe's of impermissible sex

discrimination under federal and Connecticut law. She did not (and could not) allege that anyone at Trader Joe's had ever said or done anything prior to her termination even hinting of sex discrimination—but she claimed that, notwithstanding her patently ill-advised decision to fly to Mexico during an "all-hands-on-deck" moment, she was terminated because of her gender.

Despite extensive discovery, as the District Court concluded, Plaintiff has identified no evidence that casts doubt on the bona fides of Defendant's well-chronicled reason for ending her employment or even remotely links the termination decision to her gender. Similarly, Plaintiff failed to proffer any evidence that Trader Joe's afforded more lenient treatment to similarly situated male employees who engaged in comparable conduct. These evidentiary shortcomings render Plaintiff incapable of substantiating her discriminatory discharge theory and unable to survive summary judgment.

For these reasons, as detailed more fully below, the District Court's judgment should be affirmed.

## STATEMENT OF THE CASE

### I. Plaintiff had an eleven-year upward trajectory with Trader Joe's.

Plaintiff was hired by Ben Myers, then a Regional Vice President at Trader Joe's, and Chris Maguire, a store Captain, in 2008 as Novitiate (an employee in training). Joint Appendix ("JA") 50-51. A year later, she was promoted to the role

of Captain, or store manager. JA51-52. By 2012, Plaintiff was again promoted, this time from Captain to the role of Regional Vice President ("RVP"). JA52, 170. Plaintiff remained in this senior-level position until she was terminated in 2020.

As an RVP, Plaintiff was responsible for supporting Trader Joe's stores in Connecticut and two areas of New York, Westchester County and Long Island. JA124. The RVP position is a lucrative position, where, during her last year, Plaintiff received a total compensation package of $300,000 and reported directly to Ed Seeker, an Executive Vice President of Stores. JA79-80; JA113-14. Furthermore, between 2016 and 2019, Plaintiff received one of the highest bonuses awarded by the company for her leadership over the stores she oversaw. JA53.

## II. Beginning in 2019, Plaintiff made multiple management errors.

### A. In January 2020, Plaintiff received a written warning after a significant management failure to uncover employee theft.

In November 2019, Plaintiff brought to Seeker's attention that a Mate, or assistant manager, in one of the stores in her region had been processing fraudulent refunds. JA54. Plaintiff discovered this fraud through her review of reports summarizing refund activity that were sent to RVPs and Captains on a weekly and monthly basis. JA53, 55. Those reports indicated when a store's refund level was higher than usual and whether there were atypical refund patterns in a store. JA54. A higher-than-normal rate could indicate, for example, mistakes by crew members processing refunds, a need for retraining, or even theft. JA119. In this case, the

5

excessive refunds were the result of embezzlement—the Mate at that store was processing false cash returns and stealing the proceeds. JA54. The individual embezzled over $75,000, taking "upwards of $1,000 to $2,000 at a time." JA56.

This loss accumulated over the course of 18 months before Plaintiff realized what was happening. JA56. During her deposition, Plaintiff concedes that she "should have found [the embezzlement] sooner." JA58. She wrote in her annual self-assessment, "I did not consistently review and follow up with my Captains on the weekly refund reports resulting in a significant financial loss . . . I dropped the ball, I did not do a regular weekly deep dive on all stores, [and] instead relied far too heavily on the Captains to look at the reports and advise me of any concerns." JA84.

Plaintiff's direct supervisor and champion[1], Ed Seeker—who had been Plaintiff's direct supervisor since her promotion to RVP—agreed. JA114. He issued her a Written Warning after the incident, essentially concluding that she was asleep at the wheel. He wrote, "[b]ased on a detailed review of the theft, it is difficult to understand how you missed this situation for 18 months. . . . This kind of theft could have been easily identified earlier with the reports you've been given. In this incident, you failed to use good situational leadership to help a newly

---

[1] Seeker was involved in Plaintiff's promotion to RVP. *See* JA114.

promoted Captain learn how to run her store effectively and be more successful in her new role." JA91.[2]

In January 2020, Seeker expressed a similar sentiment in his annual review of Plaintiff, telling her that "[h]ow she used and implemented situational leadership was the root cause of her mistakes." JA87. In his review, Seeker cautioned Plaintiff that although she "h[as] done a lot of good things in the region to help them get to where they are today," "[t]he low hanging fruit is done and your role is changing. You need to adapt and relook at how you can better apply situational leadership to what you already do well." JA88. He closed his review on a positive note, assuring Plaintiff that he was "here to support you in any way that I can and look forward to what 2020 will bring for you and your stores." JA88.

Importantly, Trader Joe's considered and discussed both terminating Plaintiff and demoting her from the RVP role because of her failure in leadership

---

[2] Plaintiff insists that she "'spot-checked' her refund reports every few weeks to evaluate whether any specific store's refunds were atypical." Appellant's Opening Brief (OB) at 4. She states that for herself and her peers, "checking refund reports was not an organizational 'focus' or 'priority' when compared to their day-to-day responsibilities, and Trader Joe's did not tell the RVPs how frequently it expected them to check the reports." OB 4-5. However, Plaintiff admittedly never filed any kind of formal rebuttal to the official warning she received detailing these allegations. JA56-57. Instead, in an email to Seeker on December 4, 2019, Plaintiff admitted that she was "only digging in deeply every few months unless the numbers seemed off" and "certainly should have been more diligent with my deeper review of the reports." JA57; JA93.

before making its decision to only give her a written warning with *no* change in position or responsibilities. JA129. Trader Joe's chose to give Plaintiff a second chance given her history and their hope for her future with the company.

### B. In mid-March 2020, Plaintiff took a vacation to Mexico, amidst the chaos and fear that accompanied the onset of the coronavirus pandemic, and was terminated for her extraordinarily poor leadership decision.

Plaintiff booked a family trip to Mexico in early February. JA60. The vacation was to begin on March 16, 2020. JA61. Sometime around January or February of 2020, Plaintiff notified Seeker of the anticipated vacation. JA61. In early March, Plaintiff reminded Seeker about the trip by phone, and he asked her to send him an email reminder, which she sent on March 4, 2020. JA61, 94. Although Seeker received this email, during this time he was technically on medical leave for chemotherapy treatment and was transitioning his responsibility to others. JA61, 62, 126.

Plaintiff's vacation to Mexico coincided with what she herself referred to as "Coronavirus craziness." JA68. On March 7, 2020, Governor Andrew Cuomo declared a state of emergency for New York State, with Westchester County, an area under Plaintiff's purview, leading the entire state in reported cases.[3] On

___

[3] *See* At Novel Coronavirus Briefing, Governor Cuomo Declares State of Emergency to Contain Spread of Virus, March 7, 2020, https://www.governor.ny.gov/news/novel-coronavirus-briefing-governor-cuomo-declares-state-emergency-contain-spread-virus.

8

March 10, 2020, Connecticut, the other region under Plaintiff's purview, also declared a public health emergency.[4] Finally, on March 13, 2020, President Trump declared a national health emergency.[5]

Ylana Ebba, another Trader Joe's RVP, later described the environment in stores at this time as chaotic, filled with "a lot of anxiety, people . . . terrified to work . . . people . . . getting sick." JA158. Laurie Mead, Vice President of Human Resources, described the middle of March 2020 in the following way:

> We knew that people were hoarding product, that people had started to become very ill. No one knew how this virus was being transmitted. I don't remember our—our crew member count at the time, but you know, we had, what, 50,000 crew members out in stores working themselves to the bone and afraid, very, very fearful that they might be exposed. We were spent. We were working seven days a week trying to figure everything out.

JA185.

Jon Basalone, President of Stores for Trader Joe's, explained that "[t]his was at a time when crew members were told, hey, everyone else is going into lockdown. You need to keep working. And by the way, your life is at risk when you go to work. . . . This was a time when nobody knew where this was headed.

---

[4] *See* Declaration of Public Health and Civil Preparedness Emergences, March 10, 2020, https://portal.ct.gov/-/media/Office-of-the-Governor/News/20200310-declaration-of-civil-preparedness-and-public-health-emergency.pdf.

[5] *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15,337 (Mar. 18, 2020).

9

And we needed people to really step up as leaders." JA143. In light of the circumstances, it was "all-hands-on-deck." JA173.

As March progressed, Ebba described how things "w[ere] getting worse and worse . . . as hysteria grew, as COVID cases appeared in stores, as people got sick, a lot of confusion with information from the CDC and everywhere else that you were getting information. So it progressively got worse every single week." JA159.

Despite the palpable and growing chaos, on March 10, 2020, Plaintiff emailed Ebba as a fellow RVP to ask Ebba to cover her stores during her vacation. JA68. At that time, Ebba agreed. JA103. Two days later, on March 12, Shannon Curran, another RVP, had a phone conversation with Plaintiff.[6] JA66, 67, 198-200. During their conversation on March 12, Curran told Plaintiff how busy and stressful things were, and how swamped she was:

> My stores were super busy, not enough stock, crew were very worried about their health, and crew and stores reaching out constantly with questions and concerns (gloves, masks, schools closed, nervous to work, high risk, etc.). I told her I was swamped and very tired. I told her that with the number of crew reporting that they were trying to get tested, I was sure we would have a crew test positive the following week just doing the math.

JA200.

---

[6] While Plaintiff professes a lack of recollection of the particulars of that conversation, Curran recalls the exchange, and Plaintiff concedes she cannot dispute Curran's account. JA66-67.

10

Plaintiff commiserated with Curran, stating it was just as bad in her territory, and noted she had 3 stores affected by a government mandated quarantine in Westchester County. *Id*. But then, Plaintiff pivoted, explaining that she was planning to leave soon for a trip to Mexico. *Id*. Curran explains:

> As it was a casual conversation, I recall my first statement after hearing that was "Are you fucking crazy?" She laughed. I defensively told her that I hoped she wasn't calling me to ask me to cover her stores . . . because I was swamped and there was no way I could do it. She said no, that she wasn't asking me to cover her. I asked her if she was nervous about going as I heard that they could close the Mexico border. . . . She said that there were ***worse places to get stuck*** and that she would just bring her laptop and work remotely.

JA200 (emphasis added).

Curran told Plaintiff that were she in Plaintiff's shoes, she "would be nervous about going to Mexico" and that she was cancelling her planned trip to visit her parents on March 21 because she was nervous "that if something happens with my stores that [she] would need to be [t]here." *Id*.

Plaintiff ignored Curran's advice. Plaintiff also seemingly did not consider or care about the optics of her decision to leave the country to work "remotely" at a time when her direct and indirect reports were compelled to come in every day as "essential workers" and risk contracting a deadly virus. JA155.

On Friday, March 13, three days before Plaintiff's vacation, Plaintiff learned that she would be reporting to Ben Myers, now an Executive Vice

11

President, on an interim basis during Seeker's medical leave. JA62. Later that day, on a conference call with the RVPs, Myers confirmed his interim role and specifically stated that, given the COVID-19 pandemic, RVPs should "minimize travel where you can." JA268 (Flanagan depo.); JA181 (Myers depo.); JA210 (Flanagan response to statement of undisputed facts). Plaintiff took notes from that conference call, writing down for herself, "Minimize travel where you can." JA62, 96. She concedes that the travel restriction applied to her as an RVP. JA64.

Although she naturally knew that her vacation was imminent, Plaintiff failed to seek input from Myers about her upcoming travel plans either during or after that call. Indeed, although she should have realized it on her own, she failed to seek any guidance whether, given the spiraling circumstances, it was acceptable for her take a personal vacation at this time. JA62-64. When asked during her deposition why she failed to ask this natural follow-up to both Myers' mandate on March 13 to take no unnecessary trips and the quickly changing circumstances brought on by the pandemic, Plaintiff replied, "I just didn't think of it." JA62, 65.

Over the weekend following that conference call, Plaintiff and her fellow RVP, Ebba, again spoke by phone in anticipation of Ebba covering Plaintiff's stores during the time Plaintiff was in Mexico. JA161. Ebba asked

12

Plaintiff if this was "the right time to be going on a trip." *Id*. Ebba

remembers attempting to reason with Plaintiff, reminding her "how crazy it

was in the stores, and then week-by-week, it just got worse and worse." *Id.*

Ultimately Ebba came right out and told Plaintiff that she should reconsider

her decision to go to Mexico. *Id*. Plaintiff nevertheless insisted that the trip

was too important to her family and that she had to go. *Id*.

At the close of that weekend, in the evening before she was heading to

the airport, Plaintiff decided "out of courtesy" to tell Myers about her trip.

JA65. On Sunday evening, March 15, Plaintiff emailed Myers:

> ***As I am loading my car***, I just realized that I did not let you know that
> I am away next week. It was approved time away long before the
> virus outbreak and had talked with Ed about the time away a few
> weeks ago. I certainly realize it is not ideal timing and although Ylana
> is covering me, I will have access to my phone and email. Believe it
> or not, I'm going to a place that has no reported cases and has not
> been impacted by the virus (Cancun). I went back and forth with my
> family and they voted to move forward with the trip (***I was out voted***).

JA488 (emphasis added).[7] She did not seek permission or reference Myers'

pronouncement from the previous Friday. Myers replied a few hours later on that

Sunday night, "Okay, good luck!" *Id*. Myers explained that he responded this way

because "She made her decision. She told me. She didn't ask for my opinion or

---

[7] As Plaintiff was on the east coast, and Myers on the west coast, it appears from
JA488 (which is Plaintiff's printout of the email exchange) that Myers received the
Sunday evening email at 6:52 p.m. (meaning that Plaintiff waited until 9:52 p.m.
Eastern Time to send it) and Myers' response was at 10:27 p.m. Eastern Time.

approval. She told me [Seeker] approved it, that's why my response was a little snarky coming back by saying, okay, good luck." JA175; *see* JA 182 (Myers not even sure from the email of "As I am loading my car," whether Plaintiff, when he responded, had already left her house).

The very next morning (Monday morning), the day of Plaintiff's departure, a shocked Myers shared Plaintiff's email with his supervisor (President of Stores), Jon Basalone. JA173. Basalone was equally shocked at Plaintiff's decision and cavalier tone, and stated that his first impression of the email was that Plaintiff was actually resigning. JA142. At his deposition, Basalone stated, "I read that email that she wrote to him about going on vacation to Mexico. And the way it was written and the manner that it was written, it read to me like this is something somebody would write who doesn't want to work here anymore." JA142.

Myers shared this view, stating at his deposition that "[t]his was sort of an all-hands-on-deck moment for us at the company. At this point most of us were working seven days a week and trying to help our stores, who are labeled as essential workers, navigate this very difficult time. . . ." JA173. Both Myers and Basalone suspected that Plaintiff only mentioned her trip for the first time at the eleventh hour because she feared she would be told to cancel. JA143, 181.

As Plaintiff's bosses were agape at her decision and Plaintiff was preparing to get on her flight on that Monday, Plaintiff sent an email to the Captains of the

14

stores she oversees (i.e., the store managers) to let them know she was headed out on vacation. The email's lighthearted tone stood in stark contrast to the seriousness of the situation. She opened by saying, "So I guess I'm going to Mexico…" JA490. The balance of Plaintiff's email gave cursory instructions for how to conduct COVID testing for staff members, how to handle social distancing of customers, manage stock for high-demand items like toilet paper and hand sanitizer, and make the shopping experience pleasant for customers through small gestures like giving them the store's excess flowers and actively maintaining the cleanliness of the store. *Id.* The email closed by acknowledging the "very challenging situation" they were currently in and encouraged the Captains to "please stay healthy" and "***try to have some fun***" with their team. *Id*. (emphasis added).

The substance and cavalier tone of Plaintiff's email lacked personal accountability and failed to consider how her departure would be perceived by her subordinates who were forced to come into work as essential workers as she hopped on a plane to Mexico for some rest and relaxation. Predictably, immediately after she arrived in Mexico, Plaintiff felt the impact of her serious failure of judgment. She received a flood of emails about customer complaints, store closures on the West Coast, and demands for hazard pay. JA75-76. By the evening of Tuesday, March 17 (i.e., the day after her arrival in Mexico), Plaintiff realized "[t]here was no way [she] could stay" in Mexico during this time of chaos

and panic. JA76. The earliest flight home she was able to secure was on Friday, March 20. JA75.

Meanwhile, during this time, Basalone and Myers consulted with two senior members of leadership (both women), Kathryn Cahan, General Counsel, and Laurie Mead, Vice President of Human Resources, about the series of decisions Plaintiff made, culminating in her going on vacation as COVID-related chaos and panic gripped her stores. JA142, 145, 187, 196-97. Mead was similarly in disbelief at Plaintiff's choices, which displayed deficient decision-making, integrity, and teamwork, and she thought that Plaintiff should have, at the very least, called Myers (instead of sending a last-minute Sunday night email simply declaring that she is leaving), notwithstanding Seeker's earlier approval before the COVID situation escalated. JA185-87, 197 (Mead); JA145 (Basalone).

After speaking with Myers, Mead, and Cahan, Basalone decided to terminate Plaintiff's employment. JA142. It was further decided that Plaintiff should be told immediately so that her position could be covered, reassuring the crew members in her stores that they would have leadership during this time. JA143-44. Basalone called Seeker (who was out on medical leave) to inform him of the decision. JA145. Basalone explained the circumstances, and Seeker immediately agreed with the rationale and the decision to proceed with termination, saying "it showed a

really poor lack of leadership and understanding of the moment that she was in
. . . ." JA127; *see also* JA115-16.

Basalone told Myers to inform Plaintiff of the decision. On Wednesday,
March 18, two days after Plaintiff departed for Mexico, Myers sent Plaintiff a text
message to inform her that "based on [her] recent performance and [her] decision
to take vacation during the current circumstances, we're ending your employment
effective today." JA68; *see also* JA492-93 (screen shot of text message). Myers
then informed others in Trader Joe's senior management (including Mead, Cahan,
and Basalone) that he had sent the agreed-upon text. JA503.

That same day, Plaintiff responded by text to ask for reconsideration. JA493-
95. On Friday, March 20, 2020, Plaintiff emailed Basalone, again seeking
reconsideration of the decision. JA497-500. The email was several pages long, and
not once did Plaintiff reference a belief that the decision was made with an
improper motive, let alone motivated by gender bias. She acknowledged Myers'
likely lack of knowledge of her plans and that her Sunday night email to Myers
may have been inappropriate. JA497 ("…realize now how it may have read"); that
Myers likely did not already know about her vacation plans until she sent that
email, *id.* ("it honestly slipped my mind that I had not told him I was supposed to
be away for my 1 year wedding anniversary nor had Ed [Seeker, on medical leave]
probably mentioned it"); and that she had acted inappropriately in not addressing

17

her plans with Myers earlier, even if her then-supervisor Seeker had at an earlier time approved her vacation plans, *id.* ("The responsibility was mine to think about it sooner but I too was working non-stop and simply did not."). *See also* JA499 ("I certainly should have called [Myers] and naive as it may sound, it was late in the [Sunday] evening when I realized I had not mentioned my time away and felt an email was a better option.")

Basalone reviewed the Friday, March 20 email and responded on the subsequent Monday to confirm that the company's decision was taken carefully after he had consulted with several people in the company "to make sure the emotions caused by the current crisis were not a factor in the decision" and that "our decision is final." JA500.

### III. Plaintiff accused Trader Joe's of sex discrimination, but the District Court granted summary judgment for Trader Joe's because Plaintiff had no evidentiary support for her claim.

Six months later, on September 23, 2020, Plaintiff alleged sex discrimination in complaints filed with federal and state agencies, which released jurisdiction and issued a right-to-sue letter on March 23, 2021. JA9. On June 4, 2021, Plaintiff filed her Complaint in the District of Connecticut. Plaintiff alleges two counts of discrimination—the first in violation of federal law (Title VII, 42 U.S.C. § 2000e, *et seq.*) and the second in violation of Connecticut state law (Conn. Gen. Stat. § 46a-60, *et seq.*, commonly known as the Connecticut Fair Employment Practices

Act or CFEPA). JA8-20. After the parties had a full opportunity for discovery,
Trader Joe's filed its Motion for Summary Judgment. JA31-33.

The District Court granted summary judgment to Trader Joe's. Special
Appendix ("SPA"), 1-14. The court first noted that both federal and state law
follow the burden-shifting framework set out in *McDonnell Douglas Corp. v.
Green*, 411 U.S. 792 (1973). SPA8 (citing *Kovaco v. Rockbestos-Suprenant Cable
Corp.*, 834 F.3d 128, 136 (2d Cir. 2016), and *Bentley v. AutoZoners, LLC*, 935
F.3d 76, 88 (2d Cir. 2019) (CFEPA)).

The court found that Plaintiff failed to identify "similarly situated
comparators in that none of them took an international vacation at the height of the
COVID-19 pandemic after first receiving a written warning or having negative
performance issues." SPA10. The court went on to note that "Plaintiff concedes the
same." *Id.* (quoting deposition testimony at JA67-68). The court specifically found
that "[t]he two male RVPs named in the Complaint who allegedly took vacations
during the pandemic and were not terminated—Perry Zetterstens [sic][8] and Chris
Maguire—are . . . not similarly situated to Plaintiff as there is no indication from
the record that they had negative performance issues prior to taking their respective

---

[8] Plaintiff's complaint referred to "Zetterstens," as did the District Court's
decision. In fact, his last name is Zetterstein, with the correct spelling used
throughout the parties' briefing on summary judgment and again in this Court.

19

vacations." *Id.*[9] Furthermore, they did not "travel internationally after the March 13 conference call on which Myers advised the RVPs to minimize travel." SPA11. "Zetterstens [sic], who was the only individual Plaintiff named as being similarly situated during her deposition, traveled domestically *the week before* Plaintiff's trip, and was able to cut his trip short immediately after being informed by Ylana Ebba, a fellow RVP, that the situation was getting 'precarious' in stores." *Id.* (emphasis added). The court concluded that because "Plaintiff cannot identify any males who went on vacation after the March 13 conference call (and who were not disciplined)[,] Plaintiff has thus failed to proffer a comparator who is similarly situated in all material respects, as required." *Id.* (record citation omitted). Without a similarly situated comparator, the District Court concluded that Plaintiff cannot survive summary judgment.

---

[9] On appeal, Plaintiff limits her argument only to Mr. Zettersten. *See* OB 13 n.3, 10-11, 24-27. "[A]rguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief." *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005). Similarly, the District Court also addressed a separate argument Plaintiff made regarding employees who were demoted but not fired after poor performance. The court explained that "[t]he five employees who Plaintiff claims were demoted after negative performance issues— Michael Krause, Greg Paquet, Rory Violette, Rich Mills, and Jay Hughes— arguably fared *worse* than Plaintiff after she failed to discover the embezzlement in a timely fashion; unlike those employees, Plaintiff only received a written warning, and was not demoted or terminated." SPA10 (emphasis in original). This argument too is waived because Plaintiff does not raise it in her Opening Brief.

The court also found that "Plaintiff fails to provide any evidence that would allow a reasonable jury to find that using her vacation and recent negative performance as a basis for termination was a pretext for discrimination." SPA12. The court noted that "[o]nly where an employer's business decision is so implausible as to call into question its genuineness should this Court conclude that a reasonable trier of fact could find that it is pretextual." *Id.* (quoting *Fleming v. MaxMara USA, Inc*., 371 F. App'x 115, 118 (2d Cir. 2010)).

Finding no evidence of disparate impact or pretext, the court granted summary judgment to Trader Joe's.

## SUMMARY OF THE ARGUMENT

Under both Title VII and CFEPA, a plaintiff advancing a gender discrimination claim must at a minimum prove that her sex was a motivating factor in the decision. *Naumovski v. Norris*, 934 F.3d 200, 213 (2d Cir. 2019); *Wallace v. Caring Sols., LLC*, 213 Conn. App. 605, 626 (2022). Also, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (internal quotation marks and citations omitted).

Here, although Plaintiff contends that she satisfied her burden to establish a *prima facie* case for sex discrimination by simply showing that Trader Joe's filled

21

her position with a male employee, she ultimately cannot identify facts suggesting that she was the victim of intentional sex discrimination, including that Trader Joe's legitimate, non-discriminatory reason for firing her was in fact pretext for sex discrimination. Plaintiff's argument that Trader Joe's flip-flopped on its approval of her vacation, suggesting pretext, is belied by the undisputed record evidence. And Plaintiff's argument that one of her male colleagues, Perry Zettersten, was treated more favorably fails, because Plaintiff's and Zettersten's circumstances are not at all comparable. Lacking anything more than conclusory statements in support of her claim of sex discrimination, Plaintiff is left with arguing that Trader Joe's made an unwise business decision in letting her go—but Title VII and CFEPA are not concerned with the wisdom of corporate decision-making. Plaintiff therefore cannot survive summary judgment. For this reason, the District Court's judgment should be affirmed.

## LEGAL STANDARDS

This Court reviews a district court's grant of summary judgment *de novo*. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 40 (2d Cir. 2000). Summary judgment is appropriate "if there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law. A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. When viewing the evidence, the court must assess

the record in the light most favorable to the non-movant and ... draw all reasonable inferences in [the non-movant's] favor." *Id*. at 41 (internal quotation marks and citations omitted).

"[U]nsupported allegations do not create a material issue of fact [and s]ummary judgment is appropriate even in discrimination cases, for, as this Court noted, the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." *Id.* (internal quotation marks and citations omitted).

Where, like here, there is no direct evidence that discriminatory animus affected an employment decision, gender discrimination claims under Title VII and CFEPA are analyzed using the familiar burden-shifting paradigm adopted by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Ragin v. Riverbay Corp*., No. 20-2233-CV, 2021 WL 4057196, at *2 (2d Cir. Sept. 7, 2021) (Title VII); *Wallace v. Caring Sols., LLC*, 213 Conn. App. 605, 615 (2022) (CFEPA).

"The purpose of the *McDonnell Douglas* burden-shifting framework is to progressively sharpen the inquiry into the elusive factual question of intentional discrimination." *Bucalo v. Shelter Island Union Free School Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (internal citations and marks omitted).

At the first stage, the plaintiff bears the burden of establishing a *prima facie* case. … Establishment of the *prima facie* case in effect creates a

23

presumption that the employer unlawfully discriminated against the
employee. At the second *McDonnell Douglas* stage, the presumption
created by the *prima facie* case places upon the defendant the burden
of producing an explanation to rebut the *prima facie* case—i.e., the
burden of producing evidence that the adverse employment actions
were taken for a legitimate, nondiscriminatory reason. However,
while the presumption shifts the burden of *production* to the
defendant, the ultimate burden of persuading the trier of fact that the
defendant intentionally discriminated against the plaintiff remains at
all times with the plaintiff. If the defendant satisfies its burden of
production, then the presumption raised by the *prima facie* case is
rebutted and drops from the case. At the final stage, the plaintiff then
has the opportunity to demonstrate that the proffered reason was not
the true reason for the employment decision—a burden that merges
with the ultimate burden of persuading the court that she has been the
victim of intentional discrimination.

*Id.* at 128-29 (emphasis in original) (internal quotation marks and citations

omitted).

Ultimately, under both Title VII and CFEPA, a plaintiff advancing a gender

discrimination claim must at a minimum prove that her sex was a motivating factor

in the decision. *Naumovski v. Norris*, 934 F.3d 200, 213 (2d Cir. 2019); *Wallace*,

213 Conn. App. at 626. "Although intermediate evidentiary burdens shift back and

forth under this framework, the ultimate burden of persuading the trier of fact that

the defendant intentionally discriminated against the plaintiff remains at all times

with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143

(2000) (internal quotation marks and citations omitted).

## ARGUMENT

### I. Plaintiff's argument that she established a *prima facie* case for discrimination without showing disparate treatment is not a basis for reversal.

To establish a *prima facie* case of sex discrimination, Plaintiff must show that: "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (internal quotation marks and citations omitted).

"[A] showing of disparate treatment is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case. Raising such an inference, however, requires the plaintiff to show that the employer treated him or her less favorably than a similarly situated employee outside of the protected group. A similarly situated employee is one similarly situated in all material respects to the plaintiff." *Raspardo v. Carlone,* 770 F.3d 97, 126 (2d Cir. 2014) (internal quotation marks and citations omitted).

An employee is similarly situated to co-employees in all material respects if they were (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct." *Graham v. Long Island R.R.,* 230 F.3d 34, 40 (2d Cir. 2000). "[T]he standard for comparing conduct requires a

25

reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Id.*

However, as the Court itself has stated, "the case law on . . . whether a discrimination plaintiff *may* or *must* show disparate treatment—is confusing. Courts, including ours, have struggled with this fourth element of the *prima facie* case, as the language of the element itself has gone through various iterations in the years since *McDonnell Douglas* was decided." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001) (internal quotation marks and citations omitted). In *Abdu-Brisson*, the Court pointed to *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 63 (2d Cir.1997), which "adopted apparently inconsistent positions—even within a single case. *Compare Shumway*, 118 F.3d at 63 ('This last element of a *prima facie* case *may* be proven by showing that a man similarly situated was treated differently.' (emphasis added)) with *id*. at 64 ('To establish the fourth element of a *prima facie* case, Shumway *must* show that she was treated differently from 'similarly situated' males.' (emphasis added))." *Id.*

The *Abdu-Brisson* Court ultimately concluded that "a showing of disparate treatment, while a common and especially effective method of establishing the inference of discriminatory intent necessary to complete the *prima facie* case, is only one way to discharge that burden." *Id.* at 468. As the Court later held in *Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376 (2d Cir. 2001), in

26

some cases, the fourth element of the *prima facie* case can be satisfied by "the mere fact that a plaintiff was replaced by someone outside the protected class." *Id.* at 381.

Plaintiff argues on appeal that she met the burden of establishing a *prima facie* case at this stage of the litigation because she was replaced by a man. *See* OB 11, 19-20. Yet, the issue of whether the *prima facie* case is met here is ultimately purely academic and of no moment, because while the District Court held that the absence of evidence of disparate treatment from similarly situated men defeated the *prima facie* case, SPA8-11, it *also* held in the alternative (i.e., "[e]ven assuming that Plaintiff has established a *prima facie* case of discrimination") that the same void in Plaintiff's case entitles Trader Joe's to summary judgment. SPA12. As Plaintiff's own briefing acknowledges, proof of disparate treatment is still necessary for her to prevent Trader Joe's from obtaining summary judgment. *See* OB 24-27 (discussing disparate treatment and identifying supposed comparators). The disparate treatment analysis remains an integral part of the pretext analysis—so where Trader Joe's has offered a legitimate, nondiscriminatory reason for the termination (as it has here), Plaintiff must then still prove intentional discrimination by raising a substantial question for trial whether the reason was merely pretext for intentional discriminatory treatment on the basis of sex—and her failure to identify a similarly situated comparator

27

completely undermines her allegations of pretext. *See e.g.*, *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 568 (2d Cir. 2000) (conducting the "similarly situated comparator" analysis as part of a broader analysis of evidence of pretext).

Therefore, regardless of whether the grant of summary judgment can be upheld for lack of a *prima facie* case, the District Court's judgment may be affirmed solely on the alternative basis (also reached by the District Court) that the absence of evidence of disparate treatment still undermines Plaintiff's case. As discussed in the follow sections of this brief, Plaintiff presented no cognizable basis for a jury to reject Trader Joe's legitimate non-discriminatory explanation for her termination. *See Abdu-Brisson*, 239 F.3d at 468-470.

## II. Defendant has established a legitimate non-discriminatory reason for Plaintiff's termination.

As evident from the undisputed documentary evidence and deposition testimony of multiple witnesses (including Basalone, Trader Joe's then-President of Stores), Plaintiff was terminated because of her extraordinary decision to leave the country for rest and relaxation on March 16, just a few days after a leadership call where RVPs like Plaintiff were asked to restrict unnecessary travel given the dire situation at the time with regard to COVID-19, and the resulting "all-hands-on-deck" moment for Trader Joe's. Her own handwritten notes from that call include that travel restriction, and she acknowledged the crisis in her letter to the Captains (store managers) she supervises by giving them instructions while

28

suggesting they "try to have fun" while she is in Mexico. This was on the heels of Plaintiff's decision to alert her new supervisor, Myers, of her vacation as she was "loading her bags in the car" on the Sunday night before her flight on Monday. Naturally, by Tuesday, the overwhelming crisis led her to try (unsuccessfully) to return to this country and, when she was terminated, she wrote a long letter to Trader Joe's just a couple of days after that termination acknowledging she acted inappropriately in not properly addressing her travel plans with her supervisor. *See supra* at Section II.B (Statement of Case).

Upon hearing of Plaintiff's trip and her cavalier email to Myers, Basalone immediately felt that Plaintiff's decision reflected an abandonment of her team at a critical time. JA142. As he testified, "the way it was written and the manner that it was written, it read to me like this is something somebody would write who doesn't want to work here anymore." *Id*. However, Basalone did not rush to judgment. He discussed his shock and frustration with Plaintiff's behavior with Kathryn Cahan, General Counsel, and Laurie Mead, Vice President of Human Resources. JA142, 145, 187. Mead was "shocked" just like her colleagues and agreed that Plaintiff should have timely discussed her vacation with Myers. JA185-87, 145. When told of Plaintiff's termination while away on medical leave, even Ed Seeker, Plaintiff's long-time supervisor and champion, agreed with the

rationale and the decision, saying "[Plaintiff's behavior] showed a really poor lack of leadership and understanding of the moment. . . ." JA127; *see also* JA115-16.

As this evidence shows, there was collective agreement across the executive suite that Plaintiff's actions represented an extraordinary failure in leadership at a critical time for the company and were grounds for termination. Trader Joe's plainly met its burden of "producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason," which places the burden squarely on Plaintiff to prove intentional discrimination by then presenting evidence that "the proffered reason was not the true reason for the employment decision" and that the true reason was invidious discrimination solely on account of her gender. *Bucalo*, 691 F.3d at 128-29 (internal quotation marks and citations omitted).

### III.  Plaintiff failed to demonstrate that Trader Joe's reasoning is pretext for sex discrimination.

Plaintiff argues that this collective decision by Trader Joe's management (both male and female) is pretextual. OB 20-27. Plaintiff insists that "a jury could find Trader Joe's' explanation implausible" because they flip-flopped on their approval of Plaintiff's vacation and that "a jury could find that a similarly situated man received better treatment." OB 21. Plaintiff concludes that "[s]eparately and together, then, this evidence requires a jury trial to determine the true reason for Ms. Flanagan's termination." *Id*. However, for starters, Plaintiff identifies no such

30

evidence of flip-flopping, and the singular comparator that Plaintiff identifies is not similar to Plaintiff in all material respects, as required under this Court's precedent. No one, other than Plaintiff, left the country during the critical time period at issue (after the instruction to avoid unnecessary travel) and also had a prior significant performance deficiency. Moreover, conspicuously absent from Plaintiff's brief is any reference to any other evidence that could possibly suggest that Trader Joe's true reason for terminating her was on account of her gender.

### A. Plaintiff failed to identify facts that call Trader Joe's explanation for Plaintiff's termination into question.

Plaintiff argues that "[w]here an employer asserts that it terminated an employee for an action that the employer expressly authorized the employee to take, a reasonable observer could wonder whether that employer's *post hoc* assertion is worthy of belief" and therefore "create[s] a triable issue on the question of pretext." OB 21-22. Here, Plaintiff asserts that she obtained approval from Trader Joe's for her trip three different times—"[t]wo months before her anniversary family trip to Mexico"; "[a] month later"; and "[t]he night before she left." OB 23.

None of the cases Plaintiff cites in support of this argument are binding on this Court as they are cases from three sister circuits—the Fourth, Fifth, and Seventh Circuits. *See* OB 22. More importantly, the decisions are not persuasive because their facts are not remotely analogous to the undisputed facts of this case.

In all the cases Plaintiff cites, the circumstances surrounding the defendant company's alleged "back-and-forth" or "approval-then-disapproval" (*see* OB 23) remain constant. The only thing that changes is the employer's decision on a given issue. In this case, however, Trader Joe's didn't "flip-flop"—the world fundamentally changed between early February, when Plaintiff booked her trip after obtaining approval from her prior supervisor before his medical leave, and March 16, when she went on her trip and, as she has acknowledged, when the temporary replacement supervisor (who had announced the travel restrictions on March 13) likely was unaware of her vacation plans. *See supra* at Section II.B (Statement of Case).

For example, in *McKinney v. Office of Sheriff of Whitley County*, 866 F.3d 803 (7th Cir. 2017), the plaintiff was allegedly fired for, among other reasons, misusing his gasoline credit card. *Id.* at 811. However, the plaintiff "presented evidence that he received express permission from his supervisors to use his credit card and that other officers used their credit cards in the same way he had." *Id*. The court concluded that such evidence of flip-flopping "would easily support an inference that the [defendant's] rationale for firing [plaintiff] was . . . dishonest," and "[e]vidence that the employer has offered false reasons for its actions permits an inference of unlawful discrimination." *Id*. at 811, 814.

32

Here, by March 4, when Plaintiff confirmed her trip with Ed Seeker, neither New York, Connecticut, nor the federal government had declared a state of emergency. *See supra* at Section II.B (Statement of Case). By March 16, when Plaintiff went on her trip, all three governmental entities had issued separate emergency declarations and directives. *Id.* As Plaintiff's colleague, Ebba, explained, the world was constantly changing for the worse during this precarious time. JA159.

Consistent with the changing circumstances, on March 13 (just three days before Plaintiff was scheduled to depart), the RVPs met on a call with their interim supervisor, Ben Myers, who specifically told RVPs they should minimize travel until further notice. JA62.

Moreover, Plaintiff's final note to Myers, on March 15, the Sunday evening before her flight, was plainly not an email seeking "approval" as Plaintiff argues in her brief. *See* OB 23. Plaintiff argues:

> The night before she left, she emailed her interim supervisor to confirm – for at least a third time – that she was going on her previously-approved vacation. He replied: "Okay, good luck!" He did not instruct her to cancel her trip; did not attempt to call her; and did not warn her that her job might be on the line. Ms. Flanagan reasonably interpreted these approvals as what they were: approvals.

OB 23.

However, it is unreasonable for Plaintiff to now characterize Myers' curt email as an approval. Her email that Sunday evening actually stated:

33

> As I am loading my car, ***I just realized that I did not let you know that I am away next week***. ***It was approved time away long before the virus outbreak and had talked with Ed about the time away a few weeks ago.*** I certainly realize it is not ideal timing and although Ylana is covering me, I will have access to my phone and email. Believe it or not, I'm going to a place that has no reported cases and has not been impacted by the virus (Cancun). I went back and forth with my family and they voted to move forward with the trip (I was out voted).

JA488 (emphasis added). In other words, she simply announced her departure, while she was loading her car, and her pre-arranged plan for coverage.

Nothing in this email seeks permission or approval. The record does not reveal that Plaintiff even had a way of knowing if Myers would see the email before the next day (a Monday) when she would be traveling to the airport with her family. The email merely states that she will be "away next week" (i.e., this coming week) pursuant to approval that she had obtained "long before the virus outbreak." *Id*. Indeed, Plaintiff herself described in her deposition that she sent the email to Myers "out of courtesy." JA65. In her contemporaneous letter of Friday, March 20, asking for reinstatement to her job, she wrote how Myers "probably" had not known of her trip, that it had "slipped [her] mind" that she had not told him, and that she had failed in her "responsibility" to "think about it sooner" to alert Myers and she should have called Myers instead of emailing him in that fashion. JA497, 499. Myers, at the first possible opportunity on that Monday morning, went to his own supervisors due to the shock of getting that last-minute Sunday night email. *See supra* at 14 (Statement of Case). Of course, Plaintiff

34

herself understood that she should not be traveling at this time—she outright told Myers in her Sunday email, she was "out voted" by her "family" and therefore was proceeding with the trip. JA488. For all these reasons, a reasonable jury cannot infer that Plaintiff's international family trip on March 16 was "approved" multiple times, including after the March 13 conference call, and that it was disapproved only *after* she had already departed as a cover-up for gender discrimination.

More fundamentally, Plaintiff's reasoning fails because Myers was not required to respond to Plaintiff on a Sunday night after receiving her email; he was not required to warn her (before he could even talk to his own supervisors) that her job might be on the line; and Myers most certainly was not obligated to promptly respond that evening by telling Plaintiff to cancel her trip. Plaintiff was fired because of *her failure* to appreciate the gravity of the situation, and act with the situational leadership responsibility required of someone in her high position within Trader Joe's management ranks. *See supra* at Section II.B (Statement of Case).

Plaintiff could hardly be "dumbfounded" (OB 23) by Trader Joe's decision to terminate her for her serious lapse in judgment—her colleagues all warned her multiple times that her decision to take this trip was unwise. One of her peers, RVP Shannon Curran, testified that when Plaintiff told Curran about her upcoming trip on a March 12 phone conversation, Curran was shocked and discouraged Plaintiff

35

from going on the trip. Curran asked Plaintiff if she was "fucking crazy" and told Plaintiff that if she were in Plaintiff's shoes, she "would be nervous about going to Mexico" and that she was cancelling her upcoming trip to visit her parents on March 21 because she was concerned "that if something happens with my stores that [she] would need to be here." JA200. Plaintiff ignored Curran's advice and maintained a complete lack of concern for the stores she oversaw during this time of crisis.

Curran was not alone in warning Plaintiff. On the weekend before Plaintiff's Monday departure, Plaintiff and Ebba (another RVP) again spoke by phone. On that call, Ebba asked Plaintiff if this was "the right time to be going on a trip." JA161. Given buying frenzies and panic in stores that seemed to be getting "worse and worse," Ebba ultimately came right out and told Plaintiff that she should reconsider her decision to go to Mexico. *Id.* But Plaintiff insisted that the trip was too important to her family and that she had to go. *Id.*

Even Plaintiff herself acknowledges that the "timing" of her trip was "certainly . . . not ideal" and concedes that her own instincts were to cancel her family vacation. JA488. Despite all of this, Plaintiff never thought to discuss her upcoming travel with Myers. Instead, the night before she left, Plaintiff told Myers that she was packing up to head out on vacation, despite *her own reservations*

about traveling in the changed circumstances, simply because she was "out voted" by her family. *Id.*

The other cases Plaintiff cites are similarly inapt because, like *McKinney*, they involve an employer flip-flopping on a decision where the circumstances surrounding the decision remain unchanged. In *Caldwell v. KHOU-TV*, 850 F.3d 237 (5th Cir. 2017), the court held that where "[plaintiff's] direct supervisors . . . had not just sanctioned, but mandated, that he spend less time in EDR by not scheduling him to work there," evidence of the employer then pointing to plaintiff's "lighter EDR schedule" as a basis for concluding that plaintiff's job performance was inadequate was evidence of pretext. *Id.* at 244 (referring to the employer's Electronic Digital Recording room).

In *Foster v. University of Maryland–Eastern Shore*, 787 F.3d 243 (4th Cir. 2015), the defendant claimed to have fired plaintiff in part because she "moved furniture and edited office forms without permission." *Id.* at 253. However, the court concluded that this reason could be interpreted as pretextual because the "[plaintiff's] immediate supervisor testified that [she] had been given permission to edit the office forms and that [her supervisor] had initially praised her work." *Id.* at 254. Based on this flip-flopping, the court concluded that the employer's reasoning was "so questionable as to raise an inference of deceit." *Id.*

Finally, in *Laxton v. Gap Inc.*, 333 F.3d 572 (5th Cir. 2003), the court considered a situation where "[defendant] directed [plaintiff] to have employees wear unpurchased backpacks to increase backpack sales, but then cited [plaintiff] for directing two employees to wear unpurchased tech vests during a tech vest sales contest in which her store placed first in the nation" and "directed [plaintiff] to 'do whatever it takes'" to make a lot of sales during "Tax Free Weekend" but then held it against plaintiff when she exceeded her "$75 discretionary spending authority by a minimal amount by spending $85 on pizza for employees." *Id.* at 580-81. The court concluded that because it was reasonable to infer that defendant had previously authorized the plaintiff's actions, and so it was evidence of pretext for defendant to then point to these alleged transgressions as evidence of improper conduct.

"[A]n employer [is] entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000). In this case, Plaintiff fails to identify facts suggesting that Trader Joe's affirmatively approved Plaintiff's international trip to Mexico in the height of the chaos and panic of the early days

38

of the COVID-19 pandemic and then, after she departed, inexplicably cited her for an unapproved trip, claiming that it demonstrated a lack of judgment and management acumen. Thus, Trader Joe's cannot be said to have flip-flopped by terminating Plaintiff's employment upon learning that she took such a trip. There is no evidence of pretext masking a decision motivated by impermissible discrimination.

### B. Plaintiff failed to identify any similarly situated male employees that were treated more favorably.

On appeal, Plaintiff has narrowed her argument to just one similarly situated male employee who was purportedly treated more favorably than her in similar circumstances: Perry Zettersten. Plaintiff argues that "[s]he and Mr. Zettersten were both RVPs; they were both subject to the workplace standards for RVPs; they both had the same two-up boss, Mr. Basalone; they both took a long-distance vacation in March 2020; they both attempted to return early from their trips; they both had trouble booking new return flights; and they both returned to in-person work a few days after they wanted. Yet whereas Ms. Flanagan lost her job, Mr. Zettersten experienced no consequences whatsoever." OB 25.

However, this comparison quickly collapses under the slightest scrutiny, as the District Court observed. *See supra* at Section III (Statement of Case). To be "similarly situated" for the purposes of Title VII, Zettersten "must be similarly situated in all material respects." *Shumway,* 118 F.3d at 64. In order to satisfy the

"all material respects" requirement, Plaintiff must show that her "co-employees were subject to the same performance evaluation and discipline standards . . . [and] that similarly situated employees who went undisciplined engaged in comparable conduct." *Graham*, 230 F.3d at 40. In other words, the acts of plaintiff and her comparator must be of "comparable seriousness." *Id.*

Thus, to support a showing of disparate treatment, Plaintiff must identify an RVP who had recently been admonished for a failure in leadership (in Plaintiff's case, the recent warning arising from the employee embezzlement) and inexplicably followed that up with another, egregious failure in leadership at a highly critical moment in time: taking an international trip during the chaotic early days of the pandemic, despite being specifically asked by Trader Joe's to minimize unnecessary travel. No such comparator exists.

Plaintiff argues that the District Court's conclusion that Zettersten and Plaintiff were not similarly situated because Mr. Zettersten did not "[take] an international vacation at the height of the COVID-19 pandemic after first receiving a written warning or having negative performance issues," "slic[es] the baloney mighty thin." OB26 (internal quotation marks and citation omitted).

First, Plaintiff maintains that it "makes no difference" that "one employee's vacation was 'international' and the other's cross-continental" because "both employees had to and did fly to get home." OB26. However, even Plaintiff knows

40

this isn't true. Such an assertion ignores the material difference an international border makes. Plaintiff was keenly aware of the possibility that the border between the U.S. and Mexico would be affected by the pandemic during Plaintiff's planned vacation, because when asked by her coworker Shannon Curran if she was worried about that possibility, she quipped that there are worse places to get stuck. JA200.[10]

Second, Plaintiff argues that if she traveled "at the height of the COVID-19 pandemic," then so did Mr. Zettersten. OB26. Plaintiff then goes on to argue that "[i]f anything, Mr. Zettersten's conduct was worse, since he traveled in early March when COVID 'panic buying' was in full swing; whereas Ms. Flanagan traveled the following week when, per the company's President of Stores, it was not." OB26-27. However, there are material distinctions between these situations.

Zettersten departed on his domestic trip on March 9, one week before Plaintiff. JA63-64, 163. The record is replete with testimony about how quickly the situation was spiraling when Plaintiff went on her trip. JA158-59, 143, 173, 185.

---

[10] Plaintiff denies in her D. Conn. Civil Local Rule 56(a)2 statement that Curran's "summary is accurate," but offers no evidentiary basis for such a denial, notwithstanding that Local Rule 56(a)3 requires that "each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." Indeed, she acknowledges, as she did in her deposition, that she herself does not remember the specifics of the conversation. JA208-09. With no independent recollection of the conversation, Plaintiff has no evidentiary basis for disputing Curran's testimony regarding their conversation.

Not only this, and as Plaintiff has conceded, Zettersten left for his domestic trip several days *before* the instruction to minimize travel was given by Myers to RVPs on March 13. JA64. He turned around as soon as possible when it became clear that travel away from his region was not permitted.[11] Plaintiff, of course, left for her trip *after* the instruction was given without even consulting her supervisors about how she should weigh the instruction.[12]

---

[11] The RVP covering for Zettersten testified that, due to the quickly changing circumstances, Zettersten returned early from his trip and was back at work by the time that Plaintiff departed for Mexico. JA163-64 (Elba). Plaintiff is unable to dispute that account. JA64 ("Q. And you're not aware that he came back early? A. I can't confirm or deny that, no.").

[12] It is commonly and widely known that the time between March 9 and March 13 (let alone when Plaintiff departed on March 16) was a singularly monumental moment in history, particularly March 11 when the WHO formally declared a pandemic, the President banned travel from Europe, and the NBA shut down its season, among other prominent events. *See, e.g.*, Laurel Wamsley, *March 11, 2020: The Day Everything Changed*, National Public Radio (Mar. 11, 2021), https://www.npr.org/2021/03/11/975663437/march-11-2020-the-day-everything-changed; Danielle Abreu, *The Day Everything Changed: A Timeline of March 11, 2020*, National Broadcasting Corporation (Mar. 11, 2021), https://www.nbcsandiego.com/news/coronavirus/the-day-everything-changed-a-timeline-of-march-11-2020/2545558/; Eyewitness News, *Watch the newscast from the night the world changed – March 11, 2020*, American Broadcasting Corporation (Mar. 11, 2023), https://abc7ny.com/nys-covid-new-york-nyc-tom-hanks-coronavirus/12943718/; David Ingram et al., *"It felt like the world was falling apart": An oral history of the day that changed America*, NBC News (Mar. 11, 2021) (recounting six interviewees' memories from March 11, 2020), https://www.nbcnews.com/news/us-news/-felt-world-was-falling-apart-oral-history-day-changed-america-rcna394; Associated Press, *The Latest: US advises Americans to reconsider travel abroad* (Mar. 11, 2020) (reporting on U.S. State Department advisory on March 11, 2020, to reconsider travel abroad, along with list of Latin American countries that were closing their borders),

(footnote continues on next page)

42

Finally, Plaintiff argues that "the RVPs' respective disciplinary histories are irrelevant." OB27. This is of course false because "[c]ourts in the Second Circuit have routinely recognized that a materially dissimilar disciplinary history may disqualify a peer employee from being deemed similarly situated to a plaintiff." *Toussaint v. NY Dialysis Servs., Inc.*, 230 F. Supp. 3d 198, 215 (S.D.N.Y.), *aff'd*, 706 F. App'x 44 (2d Cir. 2017).

Unlike Zettersten, Plaintiff received a Written Warning months before her trip, expressing disappointment with her leadership skills. As Ed Seeker wrote in his annual review of Plaintiff two months before her trip, Plaintiff "need[s] to adapt and relook at how [she] can better apply situational leadership to what [she] already do[es] well." JA88. Plaintiff failed on this very score—once again demonstrating a complete failure of situational leadership when her team needed her most.

Plaintiff ignores this key distinction and argues instead that "[i]f—counterfactually—Zettersten had received a final warning and she had received similar discipline but had been terminated because of her prior warning, that might not support an inference of disparate treatment. But that is not what happened." OB27.

---

https://apnews.com/article/united-nations-wa-state-wire-religion-travel-virus-outbreak-57d413557858077d861f846670ca3515.

This argument fails because the question at this juncture is not whether Trader Joe's discriminated against Plaintiff when it issued her a Written Warning after failing to notice an embezzlement scheme that took place over 18 months but did not issue a similar warning to Zettersten for taking a vacation before the company had told RVPs to limit travel. Instead, the question is whether Zettersten's travel decisions render his conduct comparable "in all material respects" to Plaintiff's. *Shumway,* 118 F.3d at 64.[13] Here, the undisputed facts show that they are not. Instead, Plaintiff paints with such a broad brush to describe the similarities between her situation and Zettersten's as to leave them both entirely unrecognizable from the realities shown by the record. Plaintiff cannot survive summary judgment because she cannot offer anything more than conclusory statements in support of her claim of sex discrimination.

Ultimately, Plaintiff's real complaint is that Trader Joe's made an unwise, hasty decision to fire her in the heat of the moment, given her long career at the company. Yet, even an employer's unfair decision (which is not the case here) cannot support the legal claims she has asserted. "This Court does not sit as a super-personnel department that reexamines an entity's business decisions." *Scaria*

---

[13] Plaintiff's reliance on *Radwan v. Manuel*, 55 F.4th 101, 138-39 (2d Cir. 2022), is equally unavailing. In *Radwan*, the only difference between the plaintiff and her comparator was the nature of the offensive gesture each athlete communicated. Here, the differences are patently more substantial.

*v. Rubin*, 117 F.3d 652, 655 (2d Cir. 1997) (internal quotation marks and citation omitted); *see Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 451 (2d Cir. 1999) ("Title VII does not insulate an individual from criticism that is not based on an impermissible reason.")

Accordingly, Plaintiff has no case to bring to trial. She has no evidence that anyone at Trader Joe's ever said or did anything even hinting of sex discrimination. Plaintiff herself was supported throughout her meteoric rise through the ranks to become a highly compensated regional manager, with the same supervisors supporting her career as she now blames for improperly firing her. Her attention to the job ultimately began to wane, first when she improperly failed to notice a longstanding embezzlement scheme (where she was simply warned, with no change in her employment) and, soon thereafter, she abandoned her responsibilities at the height of a company crisis and undermined her leadership role with the people she supervised who were working hard and risking their own lives as the pandemic swept through the nation. Plaintiff failed to identify anyone comparably situated that was treated differently than her because no one else at Trader Joe's emulated her inexplicable actions. While she ultimately sought to accuse Trader Joe's of sex discrimination, Plaintiff does nothing more than seek to distort the record, as she marshals no evidence to support her claim

45

even after the close of a long period of discovery. Summary judgment is precisely the proper remedy in these circumstances.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's judgment granting summary judgment in favor of Trader Joe's.

Dated: September 17, 2024          Respectfully submitted,

*/s/ Jeffrey R. Babbin*
Jeffrey R. Babbin
Mary A. Gambardella
Caroline B. Park
WIGGIN AND DANA LLP
265 Church Street
New Haven, CT 06510
(203) 498-4400
jbabbin@wiggin.com

Anjali S. Dalal
WIGGIN AND DANA LLP
437 Madison Avenue, 35th Floor
New York, NY 10022
(212) 551-2846

**Federal Rules of Appellate Procedure Form 6.**
**Certificate of Compliance With Rule 32(a)**

**Certificate of Compliance With Type-Volume Limitation,**
**Typeface Requirements and Type Style Requirements**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   ☒      This brief contains 11,096 words, excluding the parts of the brief exempted by Fed. R. App. P. 32, **or**

   ☐      This brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because:

   ☒      This brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point type Times New Roman type style, **or**

   ☐      This brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: September 17, 2024

                            /s/ *Jeffrey R. Babbin*
                            Jeffrey R. Babbin